773 So.2d 1079 (2000)
Stephen Todd BOOKER, Appellant,
v.
STATE of Florida, Appellee.
No. SC93422.
Supreme Court of Florida.
October 5, 2000.
Rehearing Denied December 22, 2000.
*1081 Nancy A. Daniels, Public Defender, and David A. Davis, Assistant Public Defender, Second Judicial Circuit, Tallahassee, Florida, for Appellant.
Robert A. Butterworth, Attorney General, and Barbara J. Yates, Assistant Attorney General, Tallahassee, Florida, for Appellee.
PER CURIAM.
We have on appeal the order of the trial court, entered after a new penalty phase hearing before a new jury, imposing the death penalty upon Stephen Todd Booker. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const. As explained below, we affirm Booker's sentence.

I. FACTS AND PROCEDURAL HISTORY
On December 2, 1977, the State of Florida charged Booker with first-degree murder, sexual battery, and burglary, all stemming from the November 9, 1977, death of ninety-four-year-old Lorine Demoss Harmon. The facts established during the guilt phase of Booker's trial are set forth in Booker v. State, 397 So.2d 910, 912 (Fla.), cert. denied, 454 U.S. 957, 102 S.Ct. 493, 70 L.Ed.2d 261 (1981):
The victim, an elderly woman, was found dead in her apartment in Gainesville, Florida. The cause of death was loss of blood due to several knife wounds in the chest area. Two knives, apparently used in the homicide, were embedded in the body of the victim. A pathologist located semen and blood in the vaginal area of the victim and concluded that sexual intercourse had occurred prior to death. The apartment was found to be in a state of disarray; drawers were pulled out and their contents strewn about the apartment. Fingerprints of the defendant were positively identified as being consistent with latent fingerprints lifted from the scene of the homicide. The defendant had a pair of boots which had a print pattern similar to those seen by an officer at the scene of the homicide.
Test results indicated that body hairs found on the clothing of the defendant at the time of his arrest were consistent with hairs taken from the body of the victim.
After being given the appropriate warnings, the defendant made a statement, speaking as an alternative personality *1082 named "Aniel." The "Aniel" character made a statement that "Steve had done it."
On June 21, 1978, the jury returned a verdict finding Booker guilty of first-degree murder, sexual battery, and burglary, and the trial court adjudicated Booker guilty of those three offenses.
Booker's case then proceeded to a penalty phase hearing. During the hearing, the prosecutor told the jury that the only mitigating circumstances they could consider were those listed in Florida's death penalty statute, and the trial court's jury instruction regarding mitigating circumstances was equivalent to the instruction later found to be invalid by the U.S. Supreme Court in Hitchcock v. Dugger, 481 U.S. 393, 107 S.Ct. 1821, 95 L.Ed.2d 347 (1987). At the conclusion of the penalty phase hearing, the jury, by a majority vote of nine-to-three, recommended that Booker receive the death penalty. The trial court followed the jury's recommendation, sentencing Booker to death after finding three aggravating circumstances[1] and no mitigating circumstances. Additionally, the trial court sentenced Booker to fifty-five years in prison on the sexual battery charge and thirty years in prison on the burglary charge, with those sentences running consecutive to both each other and the sentence on the first-degree murder charge.
This Court affirmed Booker's convictions and sentences on direct appeal, see Booker, 397 So.2d at 918, and the Supreme Court of the United States denied certiorari review of that decision. See Booker v. Florida, 454 U.S. 957, 102 S.Ct. 493, 70 L.Ed.2d 261 (1981). Subsequently, Booker initiatedor otherwise participated innumerous proceedings in both state and federal court.[2] Several of those proceedings are of particular relevance to the present proceedings. Specifically, in Booker v. Dugger, 520 So.2d 246, 247-49 (Fla.), cert. denied, 486 U.S. 1061, 108 S.Ct. 2834, 100 L.Ed.2d 935 (1988), this Court found that the trial court's penalty phase jury instruction regarding mitigating circumstances was erroneous in light of the U.S. Supreme Court's 1987 decision in Hitchcock, but a majority of this Court found that such error was harmless.[3] The Eleventh Circuit later determined, however, that the Hitchcock error was not harmless, see Booker v. Dugger, 922 F.2d 633, 634 (11th. Cir.), cert. denied, 502 U.S. 900, 112 S.Ct. 277, 116 L.Ed.2d 228 (1991), and, as a result, Booker's case was remanded for resentencing. While awaiting resentencing, the U.S. Supreme Court decided Brecht v. Abrahamson, 507 U.S. 619, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993), which, in essence, lessened the burden a state must meet to show that a constitutional violation did not prejudice a habeas petitioner's case. Based on Brecht, the State moved to vacate the relief previously *1083 granted to Booker, but the Eleventh Circuit rejected the State's arguments. See Booker v. Singletary, 90 F.3d 440, 442-44 (11th Cir.1996).
Booker returned for resentencing in 1997, and a new penalty phase hearing took place before a new jury in March 1998. During its case-in-chief, the State introduced documentary evidence showing that (1) Booker was convicted of robbery in 1974; (2) Booker was out of prison on "Mandatory Conditional Release" when he murdered Mrs. Harmon (the victim); (3) Booker was convicted of first-degree murder, sexual assault, and burglary for the 1977 criminal episode involving the victim; and (4) Booker was convicted of an aggravated battery which occurred in 1980. Further, the State called four witnesses to testify regarding (1) the underlying facts of the 1980 aggravated battery committed by Booker while he was in prison;[4] and (2) the facts surrounding Booker's first-degree murder, sexual assault, and burglary convictions.[5] The defense then presented its case.
The defense first introduced into evidence the affidavit of Booker's deceased grandmother, Florence Edmund, a longtime resident of Brooklyn, New York. In her affidavit, Ms. Edmund stated that Booker was born on September 1, 1953, and he grew up without knowing his father. Ms. Edmund recounted how Booker lived, at different times, with either her or his mother, and his behavior, while generally good, took a turn for the worse when he was about twelve years old. According to the affidavit, Booker was shot while in a fight, and during his hospital stay, he roomed with a person who used drugs; Ms. Edmund suspected that Booker began using drugs after his stay in the hospital. Ms. Edmund explained that Booker's mother died as the result of a stroke just before Booker's seventeenth birthday, and Booker joined the army shortly thereafter. While in the army, Booker had been hospitalized in Walter Reed Army Hospital. After his discharge from the army, Booker initially lived with Ms. Edmund, but he then unexpectedly moved to Florida. The last time that Ms. Edmund heard from Booker was through a letter he sent to her from jail in Fort Myers, Florida, and the first time that Ms. Edmund heard that Booker had been convicted of first-degree murder and sentenced to death was October 29, 1983.
The defense next introduced the affidavit of Ms. Patricia R. Singletary, a former employee in the New York City public school system. In the affidavit, Ms. Singletary summarized Booker's erratic educational history: Booker transferred in and out of eleven different schools between kindergarten and the sixth grade. Generally, the educational records described Booker as intelligent, doing particularly well in artistic endeavors, but the records also contained several references to disciplinary problems, including aggression. Absenteeism became an increasing problem as Booker grew older, and he officially left school in February 1970, at the age of sixteen.
As its first in-person witness, the defense presented Dr. George Barnard. Dr. Barnard, a psychiatrist, testified as an expert in both psychiatry and forensic psychiatry. Dr. Barnard's first contact with *1084 Booker came in December 1977, when he evaluated Booker pursuant to court order. At the conclusion of that and several other subsequent evaluations in early 1978, Dr. Barnard testified for the State during the guilt phase of the trial that Booker was both sane at the time of the murder and competent to stand trial. Dr. Barnard's next contact with Booker occurred in 1985, when defense counsel asked Dr. Barnard to review Booker's case to determine whether any mitigating circumstances existed. After reviewing Booker's case, Dr. Barnard determined that (1) Booker was under the influence of extreme mental or emotional disturbance at the time of the crime; and (2) at the time of the crime, Booker's ability to understand the criminality of his conduct or to conform his conduct to the requirements of the law was substantially impaired.
In 1997, Booker's counsel again requested that Dr. Barnard evaluate Booker, and Dr. Barnard did so, conducting a seven-and-one-half hour evaluation. In addition to such evaluation, Dr. Barnard reviewed various materials gathered in Booker's case since the initial trial had occurred. After evaluating Booker and reviewing the materials gathered in Booker's case, Dr. Barnard summarized for the jury various events in Booker's life, including Booker's mental health history.
Dr. Barnard testified that Booker started using alcohol and drugs at approximately age thirteen or fourteen, and, at age sixteen, a family court ordered that Booker undergo a psychiatric examination at Kings County Hospital in New York City. The family court ordered that Booker undergo such an examination because he had been threatening his mother and drinking more alcohol. Booker was discharged after being in the hospital for slightly over three weeks, with the recommendation that he receive some outpatient psychotherapy or counseling, which, to Dr. Barnard's knowledge, was never given.
Dr. Barnard further testified regarding three instances of sexual abuse Booker endured as a child, twice by separate baby-sitters and once by an aunt. In addition, Dr. Barnard explained that while Booker was in the army, he would regularly become intoxicated and engage in fights, with Booker being hospitalized in Okinawa on one occasion for five-to-seven days after suffering various injuries. Booker experienced blackouts during this time period, and army personnel thought that he suffered from schizophrenia.[6] Accordingly, Booker was treated with two antipsychotic drugs, Thorazine and Mellaril. Booker was then medically evacuated from Okinawa to Walter Reed Army Medical Center in Washington, D.C., where he was admitted to the psychiatric unit and continued to be treated with sizable dosages of Thorazine. Booker remained in Walter Reed for fifty-five days, and he continued to serve in the army for a short time after being discharged from the hospital. He received an honorable discharge from the army in 1974.
Within a year of being discharged from the army, Booker was taken away in an ambulance after he had been in the middle of a street wielding a knife and threatening several people. Booker was again admitted to Kings County Hospital in New York City, and he was then transferred to another hospital where he was evaluated overnight and released. The diagnosis at the first hospital was a paranoid reaction, while the diagnosis at the second hospital was intoxication. Several days prior to this incident, at least one member of Booker's family communicated to hospital personnel that Booker had engaged in bizarre behavior a few days earlier.
Dr. Barnard further testified that Booker was incarcerated in Florida during the early 1970s, and Booker's medical records for that period of incarceration showed that he (1) was seen by a psychiatrist because he thought that the water was tainted, causing a skin rash and possible *1085 impotence; and (2) was given an antiseizure medication, Dilantin. Booker explained to Dr. Barnard that during that period of time he was having hallucinations of the devil sitting or having a fist on his chest. Finally, Dr. Barnard testified that while in Gainesville in 1977, Booker was admitted to Bridge House and "Alcothon House (phonetic)" for treatment of alcohol and drug use problems, with such drugs including marijuana, LSD, heroin, LSC, hashish, and glue.
Based on all of the above, Dr. Barnard concluded at the close of direct examination by the defense that Booker was suffering from depression, alcohol and drug addiction, an "altered state of consciousness," and an antisocial personality disorder at the time of the crime. Further, consistent with his conclusion in 1985, Dr. Barnard again opined that (1) Booker was under extreme mental or emotional disturbance at the time of the crime; and (2) Booker's ability to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired at the time of the crime.
On cross-examination by the State, Dr. Barnard indicated that at no point in time was Booker insane; Booker did not have a mental disease that prevented him from understanding the difference between right and wrong. Further, Dr. Barnard conceded that much of the information he considered in evaluating Booker was based on Booker's own self-reporting, and he testified that many of Booker's statements to him were inconsistent.[7] Additionally, Dr. Barnard testified that individuals who suffer from an antisocial personality disorder, such as Booker, can be expected to lie and malinger in order to gain an advantage in a given situation. Dr. Barnard admitted that this fact could call into question the validity of any of the information Booker had provided. Dr. Barnard also conceded that he had not performed any psychological testing on Booker. Finally, Dr. Barnard testified that, in his various encounters with Booker, he had never seen any manifestation of "Aniel," the alternative personality that allegedly had troubled Booker in the past, and he opined that Booker never suffered from multiple personality disorder.
After presenting the testimony of Dr. Barnard, the defense presented the testimony of six witnesses to expound upon the literary accomplishments Booker made during his period of incarceration.[8] In sum, these witnesses testified that Booker had made substantial contributions in the field of poetry, including being published in numerous, well-respected literary journals. Finally, the defense presented the testimony of Mrs. Betty Vogh, a Gainesville woman who, along with her husband, had befriended Booker during his period of incarceration, as well as the testimony of Mrs. Mary Page McKean Zyromski, a great-niece of the murder victim. Both Mrs. Vogh and Mrs. Zyromski had helped Booker with his literary endeavors over the years, and Mrs. Zyromski specifically testified that Booker had assigned to her *1086 the royalties generated from sales of one of his published works.
At the conclusion of the penalty-phase hearing, the jury, by a majority vote of eight-to-four, recommended that Booker receive the death penalty. After conducting a subsequent hearing pursuant to Spencer v. State, 615 So.2d 688 (Fla.1993),[9] the trial court followed the jury's recommendation and again sentenced Booker to death. In its sentencing order, the trial court denominated the aggravating and mitigating circumstances established in Booker's case. Specifically, the court found four aggravating circumstances: (1) Booker committed the capital felony while he was under sentence of imprisonment (great weight); (2) Booker previously had been convicted of a violent felony (great weight); (3) Booker committed the capital felony while he was engaged in the commission of a sexual battery and burglary (great weight); and (4) the capital felony committed by Booker was especially heinous, atrocious, or cruel (HAC) (great weight). The court found two statutory mitigating circumstances: (1) Booker committed the capital felony while he was under the influence of extreme mental or emotional disturbances (great weight); and (2) Booker's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was substantially impaired (substantial weight). Finally, the court found nine nonstatutory mitigating circumstances: (1) Booker was sexually abused as a child (substantial weight); (2) Booker was physically abused as a child (substantial weight); (3) Booker was verbally abused as a child (moderate weight); (4) Booker's family life was inconsistent (moderate weight); (5) Booker's education was interrupted repeatedly (slight weight); (6) Booker suffered from alcohol and drug abuse (moderate weight); (7) while in prison, Booker substantially improved his ability to be a productive citizen and to produce creative valuable contributions to American Literature (little weight); (8) Booker demonstrated his remorse and attempted to atone for his crime (little weight); and (9) Booker was honorably discharged from the United States Army (slight weight).[10] After considering these factors, the trial court found that the aggravating circumstances substantially outweighed the mitigating circumstances, and thus sentenced Booker to death. Booker now appeals from the trial court's order imposing the death penalty.

II. ISSUES AND ANALYSIS
In this appeal, Booker raises six issues for our consideration. First, Booker claims that the trial court erred in refusing to instruct the jury regarding the consecutive prison sentences he must serve based on his prior convictions for sexual battery, burglary, and aggravated battery. Second, Booker claims that the trial court clearly erred in determining that the State's reason for exercising a peremptory challenge on venireperson Phyllis Filer, a black woman, was genuine and not a discriminatory pretext. Third, Booker claims that the trial court erred in denying the defense's request to give a special jury instruction defining "mitigating circumstances." Fourth, Booker claims that death is a disproportionate penalty in his case. Fifth, Booker argues that the trial court abused its discretion by prohibiting Mrs. Mary Page McKean Zyromski, a great-niece of the victim, from being present in the courtroom during the presentation *1087 of Booker's case in mitigation until after she had testified on Booker's behalf. Finally, Booker argues that to execute him after he has already spent over two decades on death row would constitute cruel and unusual punishment under the Eighth Amendment to the Constitution of the United States. We now address these issues in turn.

A. THE TRIAL COURT'S REFUSAL TO INSTRUCT THE JURY REGARDING BOOKER'S OTHER CONSECUTIVE SENTENCES
Regarding this first issue, Booker claims that the trial court erred by refusing to inform the jury regarding the consecutive sentences Booker received for his prior burglary, sexual battery, and aggravated assault convictions. After reviewing our prior decisions, we reject Booker's claim on the merits.
In Nixon v. State, 572 So.2d 1336, 1345 (Fla.1990), we held that a capital murder defendant, who had been convicted of three additional noncapital offenses carrying lengthy maximum penalties, was not entitled to an instruction informing the jury of the maximum sentences that could be imposed for the other crimes. See also Franqui v. State, 699 So.2d 1312, 1326 (Fla.1997) (following Nixon); Marquard v. State, 641 So.2d 54, 57-58 (Fla.1994) (same); Gorby v. State, 630 So.2d 544, 548 (Fla.1993) (stating that, according to Nixon, "during the penalty phase, there is no need to instruct the jury on the penalties for noncapital crimes a defendant has been convicted of"). Booker argues that Nixon is not controlling here because, unlike the defendant in that case, Booker has already been sentenced for the crimes other than the first-degree murder conviction. In making this argument, however, Booker overlooks several of our prior decisions applying Nixon to facts substantively identical to those in this case.
In Campbell v. State, 679 So.2d 720, 722 (Fla.1996), the defendant directly appealed a death sentence imposed on him after a resentencing hearing. After finding that the prosecutor had committed various acts of misconduct during the hearing, we reversed the defendant's sentence and again remanded for resentencing. See id. at 724-25. Before doing so, however, we addressed "several additional claims to aid in resentencing." Id. at 725. Particularly relevant to this case, we stated:
At the time of resentencing, Campbell had already been sentenced to consecutive life terms for other related crimes and now claims that the court erred in preventing him from pointing this out to prospective jurors and in declining to instruct the jury on this. This issue has already been decided adversely to Campbell. See, e.g., Nixon v. State, 572 So.2d 1336 (Fla.1990), cert. denied, 502 U.S. 854, 112 S.Ct. 164, 116 L.Ed.2d 128 (1991). We find no error.
679 So.2d at 725. Thus, in Campbell, we clearly determined that Nixon is controlling in cases such as this.
More recently, in Bates v. State, 750 So.2d 6 (Fla.1999), we again applied our holding in Nixon to facts substantively identical to those presented here. In Bates, the defendant appealed from a death sentence imposed on resentencing for a murder that occurred in 1982. See id. at 8. Relevant to this case, we stated the following in rejecting Bates' claim that the jury should have been informed of his previously imposed sentences:
[A]ppellant contends that the fact that he was already sentenced to two life terms plus fifteen years and that those sentences were to run consecutively to the sentence for the murder was relevant mitigation "in the sense that [it] might serve as a basis for a sentence less than death." We have rejected similar arguments in Franqui v. State, 699 So.2d 1312, 1326 (Fla.1997); Marquard v. State, 641 So.2d 54 (Fla.1994); and Nixon v. State, 572 So.2d 1336 (Fla. 1990).

*1088 These other sentences are not relevant mitigation on the issue of whether appellant will actually remain in prison for the length of those sentences. The length of actual prison time is affected by many factors other than the length of the sentence imposed by the sentencing court. The introduction of this evidence would open the door to conjecture and speculation as to how much time a prisoner serves of a sentence and distract jurors from the relevant issue of what is the appropriate sentence for the murder conviction.
Bates, 750 So.2d at 11. Accordingly, based on our prior decisions, we reject Booker's claim here on the merits.

B. THE PEREMPTORY CHALLENGE
Booker next argues that the prosecutor used a peremptory challenge as a discriminatory pretext. The analytical framework for addressing this issue is set forth in Melbourne v. State, 679 So.2d 759 (Fla.1996), wherein we stated the following, in pertinent part:
A party objecting to the other side's use of a peremptory challenge on racial grounds must: a) make a timely objection on that basis, b) show that the venireperson is a member of a distinct racial group, and c) request that the court ask the striking party its reason for the strike. If these initial requirements are met (step 1), the court must ask the proponent of the strike to explain the reason for the strike.
At this point, the burden of production shifts to the proponent of the strike to come forward with a race-neutral explanation (step 2). If the explanation is facially race-neutral and the court believes that, given all the circumstances surrounding the strike, the explanation is not a pretext, the strike will be sustained (step 3). The court's focus in step 3 is not on the reasonableness of the explanation but rather its genuineness. Throughout this process, the burden of persuasion never leaves the opponent of the strike to prove purposeful racial discrimination.
Id. at 764 (footnotes omitted). Regarding step 3, we provided a nonexclusive list of factors a trial court may consider in determining whether the reason given for exercising a peremptory challenge is genuine, including "the racial make-up of the venire; prior strikes exercised against the same racial group; a strike based on a reason equally applicable to an unchallenged juror; or singling the juror out for special treatment." Id. at 764 n. 8 (citing State v. Slappy, 522 So.2d 18 (Fla.1988), receded from on other grounds, Melbourne v. State, 679 So.2d 759, 765 (Fla.1996)). Finally, we stated that peremptory challenges are "presumed to be exercised in a nondiscriminatory manner" and that "the trial court's decision turns primarily on an assessment of credibility and will be affirmed on appeal unless clearly erroneous." Id. at 764-65. It is under this analytical framework that the peremptory challenge issue here must be determined.
During voir dire, the State simultaneously exercised its second, third, and fourth peremptory challenges on three women: Collette Smith, Rae Leggett, and Phyllis Filer. Citing State v. Neil, 457 So.2d 481 (Fla.1984), defense counsel immediately objected to the State's peremptory challenge of Filer, a black woman.[11] In response to the Neil objection, the prosecutor stated: "Your Honor, you'll find a pattern here that I'm looking for, and that is that I do not wish to have people that I believe will be unduly influenced by their love of the arts or their feeling for the arts, their literature." The prosecutor stated that he struck Leggett "when she finally said I love to read everything, I *1089 love the arts," and he struck Smith "when she finally said I love to read everything, I love the arts." He struck Filer, a librarian, because he thought that "on the unique facts of this case a librarian is going to be undulymay subject herself to being unduly influenced by the fact we have a person who is going to bring in, I think he's bringing in six defense witnesses who are either publishers of or editors of major academic or professional journals in the field of English literature and poetry." The prosecutor further noted that he did not seek to challenge venireperson Erica Prince, who was African-American.
Countering the prosecutor's arguments, defense counsel expressed that being an avid reader was not a race-neutral reason to exercise a peremptory challenge here because another venireperson, William Pepper, a white male, also was an avid reader and an editor but had not been excused by the State. In response, the prosecutor stated the following, in pertinent part:
No one there deals with the kinds of publications that are going to be dealt with by this person. I agree that Pepper, who, frankly, is somebody that the state has looked very closely at, Pepper has other reasons that we want to keep him, and frankly, I think they won't want to, such as his military service and history, his experience in writing letters on issues[[12]] that I think were identified him as a potentially straight juror state juror. The issue is whether or not it's race neutral, is would I keep any librarian who deals with six different excuse me. In a case which they're going to bring in editors and writers from six different nationally recognized journals, journals that they are going to use as the basis for their presentation, the high standing those journals have in the academic world, would I keep any librarian under those circumstances? No.
After hearing the arguments of counsel, the trial judge found the State's reason for peremptorily challenging Ms. Filer to be race-neutral. The judge further stated: "The only inconsistency is the applicationthe issue of application of that reason across the board. I don't find that there's any pattern here of using the peremptory challenge against Ms. Filer as establishing any kind of a pattern of excusing only jurors of her particular ethnic background," and the judge allowed the State to strike Filer. Defense counsel objected to the ruling, but the court overruled the objection.
Before this Court, Booker concedes that the State presented a race-neutral reason for peremptorily challenging Ms. Filer. Instead, Booker argues that the State's proffered reason for peremptorily challenging Ms. Filer applied equally to Mr. Pepper, and, therefore, the trial court clearly erred in finding the State's reason to be genuine. Indeed, the decisions Booker relies upon would support his argument if it were true that the State's reason for challenging Ms. Filer applied equally to Mr. Pepper. For example, in Daniel v. State, 697 So.2d 959, 960-61 (Fla. 2d DCA 1997), the Second District determined that the State's reason for exercising a peremptory challenge on a Hispanic juror was a discriminatory pretext where the proffered reason for the challenge applied equally to an unchallenged, non-Hispanic prospective juror. See also Brown v. State, 733 So.2d 1128, 1129-30 (Fla. 4th DCA 1999); Foster v. State, 732 So.2d 22, 24 (Fla. 4th DCA 1999); Randall v. State, 718 So.2d 230, 232 (Fla. 3d DCA 1998); Overstreet v. State, 712 So.2d 1174, 1177 (Fla. 3d DCA 1998); Stroud v. State, 656 So.2d 195, 196-97 (Fla. 2d DCA 1995); Richardson v. State, 575 So.2d 294, 295 (Fla. 4th DCA 1991). However, after *1090 carefully reviewing the record in the present case, we determine that the State's proffered reason for peremptorily challenging Ms. Filer was not equally applicable to Mr. Pepper, and, therefore, the trial court did not clearly err in finding the State's reason to be genuine.
During voir dire, Ms. Filer indicated that she had been a librarian for twenty-two years, with a bachelor's degree in sociology and a master's degree in library science. She indicated that she loved books but had "[n]ot really" been a writer. She stated that she read a "whole wide range" of literature, everything from "romance, to mysteries, to westerns, to nonfiction, the whole gamut." Pepper indicated that he once had been executive editor of the Gainesville Sun, and, for the first fifteen years of his professional life, worked for three newspapers in Texas, Louisiana, and Florida. Thereafter, he was a retail executive for fifteen years and ran an executive search firm for another fifteen years before retiring. He spent twenty years in the Naval Reserve and enjoyed reading history books and the Bible.
Based on their responses during voir dire, it is clear that Ms. Filer and Mr. Pepper, while similar in some ways, were sufficiently dissimilar for the State's proffered reason for challenging Ms. Filer to be inapplicable to Mr. Pepper. Specifically, the record shows that the State's proffered reason for peremptorily challenging Ms. Filer was that she was a librarian who loved the arts. Mr. Pepper was not a librarian, and while both he and Ms. Filer certainly were well-read, their interests in literatureand the arts in generalwere dissimilar. This distinction is relevant here because many of the witnesses called by Booker, a poet, to support his case in mitigation were more grounded in poetry and literature than they were in newspapers and the like.[13] Indeed, the State correctly points out that Ms. Filer had much more in common with Ms. Leggett[14] and Ms. Smith, both of whom were peremptorily challenged at the same time as Ms. Filer, than she did with Mr. Pepper. Coupled with the fact that the State did not exercise a peremptory challenge on another black prospective juror, Ms. Prince, we find that the trial court did not clearly err in determining that the State's proffered reason for striking Ms. Filer was genuine. See generally Smith v. State, 699 So.2d 629, 637 (Fla.1997) (recognizing that because a trial court's determination regarding genuineness "turns primarily on an assessment of credibility," such determination will not be overturned unless clearly erroneous).

C. REFUSAL TO GIVE A SPECIAL INSTRUCTION REGARDING MITIGATING CIRCUMSTANCES
Booker also asserts the trial court erred in denying defense counsel's request to give the following special instruction regarding mitigating circumstances: "Mitigating circumstance are circumstances that do not constitute a justification or excuse for the offense in question, but which in fairness and mercy may be considered as extenuating or reducing the degree of moral culpability." We find Booker's claim to be without merit.
During the trial below, the court gave the following instruction to the jury regarding mitigating circumstances:
Should you find sufficient aggravating circumstances do exist, it will then be your duty to determine whether mitigating circumstances exist that outweigh the aggravating circumstances.
Among theamong the mitigating circumstances you may consider, if established by the evidence, are:

*1091 One, the crime for which Stephen Todd Booker is to be sentenced was committed while he was under the influence of extreme mental or emotional disturbance.
Two, the capacity of Stephen Todd Booker to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was substantially impaired.
Three, any of the following circumstances that would mitigate against the imposition of the death penalty:
A. Any other aspect of the defendant's character, record, or background.
B. Any other circumstance of the offense.
This instruction correctly tracks the standard jury instruction regarding mitigating circumstances, see Fla. Std. Jury Instr. (Crim.) 112; see also Standard Jury Instructions in Criminal Cases No. 96-1, 690 So.2d 1263, 1267 (Fla.1997), and we have repeatedly held that clarifying instructions on mitigating circumstances are not required. See, e.g., Elledge v. State, 706 So.2d 1340, 1346 (Fla.1997) (finding trial court did not err in refusing to give special jury instruction addressing nature and functioning of mitigating circumstances where the trial court instructed jury with standard instruction on mitigating circumstances), cert. denied, 525 U.S. 944, 119 S.Ct. 366, 142 L.Ed.2d 303 (1998); Shellito v. State, 701 So.2d 837, 842 (Fla. 1997) ("This Court has repeatedly determined that the requested clarifying instructions on mitigating evidence are not required."), cert. denied, 523 U.S. 1084, 118 S.Ct. 1537, 140 L.Ed.2d 686 (1998). Accordingly, based on our prior decisions, we find Booker's claim here to be without merit.

D. PROPORTIONALITY
As to a proportionality analysis, Booker does not contest the aggravating and mitigating circumstances found by the trial court,[15] nor does he argue that the trial court should have afforded different weight to such circumstances.[16] Instead, Booker claims that his case does not involve one of the most aggravated and least mitigated of crimesespecially considering the two statutory mental mitigating circumstances found by the trial court thus precluding imposition of the death penalty in his case. In recently considering a similar claim raised by another capital defendant, we reiterated our role in determining whether death is a proportionate penalty in a given case:

*1092 It is axiomatic that the death penalty is reserved for only the most aggravated and the least mitigated of first-degree murders. See Urbin v. State, 714 So.2d 411, 416 (Fla.1998); State v. Dixon, 283 So.2d 1, 7 (Fla.1973). As such, in reviewing a sentence of death, this Court must consider the particular circumstances of the instant case in comparison to other capital cases and then decide if death is the appropriate penalty in light of those other decisions. See Urbin, 714 So.2d at 416; Hunter v. State, 660 So.2d 244, 254 (Fla.1995).
Woods v. State, 733 So.2d 980, 990 (Fla. 1999); see also Almeida v. State, 748 So.2d 922, 933 (Fla.1999) (stating that proportionality review is "two-pronged: We compare the case under review to others to determine if the crime falls within the category of both (1) the most aggravated, and (2) the least mitigated of murders."), cert. denied, 528 U.S. 1181, 120 S.Ct. 1221, 145 L.Ed.2d 1120 (2000). After carefully considering the totality of the circumstances in this case in light of our prior decisions in other capital cases, we disagree with Booker's claim here and find that death is a proportionate penalty in his case.
In arguing that death is a disproportionate penalty in this case, Booker primarily relies on our prior decision in Fitzpatrick v. State, 527 So.2d 809 (Fla.1988). We find such reliance to be misplaced. In Fitzpatrick, we found death to be a disproportionate penalty, despite the presence of five aggravating circumstances, where the defendant's emotional age was that of a nine-to-twelve year-old child, and the defendant's actions "were those of a seriously emotionally disturbed man-child, not those of a cold-blooded, heartless killer." Id. at 812. Unlike Fitzpatrick, however, the record in this case does not contain any evidence establishing that Booker acted as "a seriously emotionally disturbed man-child." Second, as we emphasized in Fitzpatrick, that case did not involve the HAC aggravating circumstance, see id. at 812 (involving police officer shot and killed during hostage situation), whereas it is uncontested in this case that HAC was properly established in the brutal sexual battery and stabbing death of the ninety-four-year-old female victim. For these reasons, we determine that our decision in Fitzpatrick is not controlling here.[17] Instead, we determine that this case is substantially similar to Robinson v. State, 761 So.2d 269 (Fla.1999), cert. denied, 529 U.S. 1057, 120 S.Ct. 1563, 146 L.Ed.2d 466.
In Robinson, the defendant pled guilty to first-degree murder after bludgeoning his girlfriend to death with a hammer. See id. at 270-71. After conducting a resentencing hearing, the trial court found three aggravating circumstances in Robinson's case: (1) the murder was committed for pecuniary gain; (2) the murder was committed to avoid arrest; and (3) the murder was committed in a cold, calculated, and premeditated manner (CCP). See id. at 272-73. Significantly, the trial court in Robinson found the same two statutory mental mitigating circumstances that have been established in this case, see id. at 273, and also found seventeen nonstatutory mitigating circumstances, including (1) verbal abuse as a child; (2) emotional abuse as a child; and (3) the defendant suffered from "personality disorders." See id. at 273. After considering the evidence presented at the resentencing hearing, we upheld the death sentence in Robinson's case.[18]See id. at 279.
*1093 Additionally, we find persuasive our proportionality analysis in Spencer v. State, 691 So.2d 1062 (Fla.1996). In Spencer, the defendant bludgeoned and stabbed his wife to death. See Spencer v. State, 645 So.2d 377, 379-80 (Fla.1994). Consistent with the jury's recommendation, the trial court sentenced Spencer to death, determining that the two aggravating circumstances in the caseprior violent felony and HAC-outweighed the two statutory mental mitigating circumstances and numerous nonstatutory mitigators, including drug and alcohol abuse, paranoid personality disorder, sexual abuse by defendant's father, honorable military record, good employment record, and ability to function in structured environment. See Spencer, 691 So.2d at 1063. On appeal, we rejected the defendant's proportionality challenge and affirmed the imposition of the death penalty. See id. at 1064-65. We similarly reject Booker's claim here, where four aggravating circumstances, including HAC, have been established, which are balanced against statutory and nonstatutory mitigating circumstances similar to those established in Spencer. See also Zack v. State, 753 So.2d 9 (Fla.2000) (upholding death penalty in case involving four aggravating circumstances, including HAC and crime committed during commission of a robbery, sexual battery, or burglary, balanced against statutory mental mitigating circumstances and three non-statutory mitigating circumstances), petition for cert. filed, (U.S. June 19, 2000) (No. 99-10062); Hildwin v. State, 727 So.2d 193, 194, 197-98 (Fla.1998) (upholding death penalty in case involving four aggravating circumstances, including HAC, prior violent felony, and under sentence of imprisonment at the time of the crime, balanced against statutory mental mitigating circumstances and significant nonstatutory mitigation, including prior sexual abuse and history of drug and alcohol abuse). In sum, after considering the particular circumstances in this case in light of our prior decisions, we determine that death is a proportionate penalty in this case.

E. MRS. ZYROMSKI'S TEMPORARY EXCLUSION FROM THE COURTROOM
As a fifth issue, Booker argues that the trial court abused its discretion by prohibiting Mrs. Zyromski, a great-niece of the murder victim, from being present in the courtroom during Booker's presentation of his case in mitigation until after she had testified on Booker's behalf. This issue comes to us in an unusual procedural posture because it is generally the State that seeks to have a murder victim's family members present in the courtroom, while the defendant generally seeks to have such individuals excluded. See Gore v. State, 599 So.2d 978, 985-86 (Fla.1992) (defendant arguing that trial court erred in excusing victim's stepmother from rule of sequestration solely because she was a relative of the victim); Sireci v. State, 587 So.2d 450, 454 (Fla.1991); Bellamy v. State, 594 So.2d 337, 338 (Fla. 1st DCA 1992) (defendant claiming due process violation because trial court allowed victim to be present in courtroom during trial); cf. Farina v. State, 680 So.2d 392, 395 (Fla. 1996) (defendant claiming he was prejudiced by the fact that surviving victims and their families were seated in the first two rows in front of the jury box); Hall v. State, 579 So.2d 329, 330 (Fla. 1st DCA 1991) (defendant challenging trial court's decision to allow victim's son to sit at counsel table and assist prosecutor at trial). Indeed, the issue here appears to be one of first impression in Florida, and it arises because Mrs. Zyromski testified on Booker's behalf. After careful consideration, we determine that Booker is not entitled to relief on this issue.
The State concluded its case-in-chief during the penalty phase on the afternoon of March 24, 1998. Immediately thereafter, Booker began presenting his case in mitigation by introducing into evidence the affidavits of Ms. Florence Edmund and Ms. Patricia Singletary. After these affidavits were introduced, the trial court adjourned *1094 the hearing until the following day.
At the beginning of the proceedings on the following day, defense counsel announced that Mrs. Zyromski had asked counsel if she could remain in the courtroom and observe the proceedings prior to giving her testimony.[19] The prosecutor objected, noting that even though a victim's family member has a right to be present in the courtroom, "if it is the strategy of the case that you are a witness in the case, then I believe that you're under the normal rules of sequestration of witnesses." After considering defense counsel's response that a member of the victim's family has more expansive rights of observation than does an ordinary individual, the trial court agreed with the State and ordered Mrs. Zyromski to remain outside the courtroom. The trial court did determine, however, that Mrs. Zyromski could remain in court after she testified. Thus, Mrs. Zyromski was absent from court until she was called to testify the following morning. Consistent with its prior determination, the trial court allowed Mrs. Zyromski to remain in court after she testified, and Mrs. Zyromski also appeared at the Spencer hearing to present a statement on Booker's behalf, as did three other members of the victim's family.
Article I, section 16(b) of the Florida Constitution provides:
Victims of crime or their lawful representatives, including the next of kin of homicide victims, are entitled to the right to be informed, to be present, and to be heard when relevant, at all crucial stages of criminal proceedings, to the extent that these rights do not interfere with the constitutional rights of the accused.
The State did not argue in the trial court, nor does it argue here, that Mrs. Zyromski did not qualify as the murder victim's "next of kin,"[20] thus placing her outside the purview of article I, section 16(b). Instead, the State argues that the general rule of sequestration outweighed Mrs. Zyromski's constitutional right to be present in the courtroom. As stated above, there is no Florida law directly addressing this issue in the posture before us for consideration. We have, however, addressed the reverse of this issue in the Gore case.
In Gore, the defendant argued that the trial court erred in excusing the murder victim's stepmother from the rule of sequestration solely because she was a relative of the victim. See 599 So.2d at 985. After reciting the language set forth in article I, section 16(b), we stated:
This provision does not provide an automatic exception to the rule of sequestration. While in general relatives of homicide victims have the right to be present at trial, this right must yield to the defendant's right to a fair trial.
The rule of witness sequestration is designed to help ensure a fair trial by avoiding "the coloring of a witness's testimony by that which he has heard from other witnesses who have preceded him on the stand." Spencer v. State, 133 So.2d 729, 731 (Fla.1961), cert. denied, 369 U.S. 880, 82 S.Ct. 1155, 8 L.Ed.2d 283 (1962), and cert. denied, 372 U.S. 904, 83 S.Ct. 742, 9 L.Ed.2d 730 (1963). *1095 However, a defendant does not have an absolute right to exclude witnesses from the courtroom. "The trial judge is endowed with a sound judicial discretion to decide whether particular prospective witnesses should be excluded from the sequestration rule." Randolph v. State, 463 So.2d 186, 191 (Fla.1984), cert. denied, 473 U.S. 907, 105 S.Ct. 3533, 87 L.Ed.2d 656 (1985). Of course, should the witness' presence cause some prejudice to the accused, the witness should not be allowed to remain in the courtroom. Where the rule has been invoked, a hearing should be conducted to determine whether a witness' exclusion from the rule will result in prejudice to the accused. Id. at 192.
In this case, although the trial judge did not hold a hearing to determine possible prejudice, he did hear argument from defense counsel on this issue before making his decision to exclude Ms. Roark. Counsel did not ask for any further proceeding, such as a proffer of testimony. In any event, the presence of Roark's stepmother in the courtroom during the trial did not prejudice Gore. Ms. Roark was not a material witness for the State; the extent of her participation at trial was her testimony that Susan usually wore several rings at one time and her identification of a necklace and four rings as similar to jewelry owned by Susan. We find no abuse of discretion in allowing this witness to be excluded from the rule of sequestration.
599 So.2d at 985-86. Similarly, in Farina, we determined that the defendant failed to establish that he was prejudiced by the presence of surviving victims and their families in the courtroom, see 680 So.2d at 395, while in Sireci, we determined that the trial court correctly allowed the homicide victim's wife and son to remain in the courtroom after they had testified. See 587 So.2d at 454.
When considered together, our decisions in Gore, Farina, and Sireci establish two general principles to be considered in analyzing a claim involving article I, section 16(b) of the Florida Constitution: (1) the rights provided to victims and victims' families under article I, section 16(b) are not absolute, as they are subordinate to the rights of an accused when the rights involved are in conflict; and (2) to be granted relief based on this type of issue, a party must establish prejudice. Given the procedural posture in this case, the first principle is not implicated; to the contrary, Booker wanted Mrs. Zyromski to be present in court. Thus, taking a literal interpretation of article I, section 16(b), Mrs. Zyromski was entitled to be present during the presentation of Booker's case. The relevant inquiry here, then, must focus on whether the purposes underlying the rule of sequestration outweighed Mrs. Zyromski's constitutional right to be present in court while Booker presented his case in mitigation.
After hearing the arguments of counsel, the trial court essentially determined that the rule of sequestration outweighed Mrs. Zyromski's constitutional right to be present in court. However, in circumstances such as this where the constitutional right to be present in court does not conflict with the accused's right to a fair trial, it is clear that the general rule should elevate the constitutional right above the rule of sequestration. Moreover, in this particular case, there is no concern that Mrs. Zyromski's testimony would be tainted by her presence in court, as her testimony primarily focused on the relationship she had established with Booker after he had been incarcerated on death row. Therefore, we determine that the trial court abused its discretion by preventing Mrs. Zyromski from being present in court until after she had testified.
Even though the trial court abused its discretion regarding this issue, however, Booker has failed to assert how he may have been prejudiced by Mrs. Zyromski's temporary, one-day absence from court. Mrs. Zyromski testified on Booker's behalf, *1096 was allowed to remain in court after she testified, and further provided a statement to the trial court at the Spencer hearing. Similar to the defendants in Gore, Farina, and Sireci, Booker has failed to show how he was prejudiced by the trial court's action, and we hold the trial court's error in temporarily prohibiting Mrs. Zyromski from being in court to be harmless beyond a reasonable doubt. See Goodwin v. State, 751 So.2d 537 (Fla. 1999) (determining that the harmless error standard set forth in State v. DiGuilio, 491 So.2d 1129 (Fla.1986), remains applicable notwithstanding the Legislature's enactment of section 924.051(7), Florida Statutes 1999). Accordingly, we determine that Booker is not entitled to relief on this issue.

F. THE LENGTH OF TIME BOOKER HAS SPENT ON DEATH ROW
The sixth and final issue presented by Booker is centered on an argument that to execute him after he has already spent over two decades on death row would constitute cruel and unusual punishment under the Eighth Amendment to the Constitution of the United States. Relatedly, Booker also claims that the State has forfeited its right to execute him under binding norms of international law.[21] We recently rejected identical claims in Knight v. State, 746 So.2d 423, 437 (Fla.1998), cert. denied, 528 U.S. 990, 120 S.Ct. 459, 145 L.Ed.2d 370 (1999), in which we stated:
Although Knight makes an interesting argument, we find it lacks merit. As the State points out, no federal or state courts have accepted Knight's argument that a prolonged stay on death row constitutes cruel and unusual punishment, especially where both parties bear responsibility for the long delay. See, e.g., White v. Johnson, 79 F.3d 432 (5th Cir. 1996); State v. Smith, 280 Mont. 158, 931 P.2d 1272 (Mont.1996). We also note that the Arizona Supreme Court recently rejected this precise claim. See State v. Schackart, 190 Ariz. 238, 947 P.2d 315, 336 (Ariz.1997) (finding "no evidence that Arizona has set up a scheme prolonging incarceration in order to torture inmates prior to their execution"), cert. denied, 525 U.S. 862, 119 S.Ct. 149, 142 L.Ed.2d 122 (1998).... We similarly reject Knight's claim under international law.
See also Elledge v. State, 706 So.2d 1340, 1342 n. 4, 1347 n. 10 (Fla.1997) (rejecting defendant's claim that death sentence could not be carried out due to alleged unconstitutional delay), cert. denied, 525 U.S. 944, 119 S.Ct. 366, 142 L.Ed.2d 303 (1998); State v. Moore, 256 Neb. 553, 591 N.W.2d 86, 94-95 (rejecting capital defendant's claim that it would violate the Eighth Amendment to execute him after his lengthy stay on death row), cert. denied, 528 U.S. 990, 120 S.Ct. 459, 145 L.Ed.2d 370 (1999). Consistent with our decision in Knight, we reject Booker's claims regarding this issue.

III. CONCLUSION
Based on the foregoing, we affirm the defendant's death sentence.
It is so ordered.
WELLS, C.J., and SHAW, HARDING, LEWIS and QUINCE, JJ., concur.
ANSTEAD, J., concurs in part and dissents in part with an opinion, in which PARIENTE, J., concurs.
ANSTEAD, J., concurring in part and dissenting in part.
I cannot join in that portion of the majority's opinion which suggests that evidence of the defendant's pre-existing substantial sentences for other crimes should not be disclosed to a jury charged with deciding whether to sentence the defendant to life imprisonment or death for *1097 murder. Jurors are naturally interested in how long a convicted murderer will actually be imprisoned in making a choice between life and death, and, logically, the jury would want to know any information that would impact on the life sentence alternative, including the existence of other sentences already imposed upon the defendant. Carried to its logical conclusion the majority's reasoning would bar a jury from considering whether life imprisonment would be an adequate punishment for the murder for which the defendant is being sentenced. The majority's decision on this point is also a slap at the jury system since it stands for the proposition that the less known by the jury the better, even if it may skew a jury's recommendation.
In fact, the failure to provide this sentencing information to the jury in this case resulted in the jury being misled about the defendant's term of imprisonment and eligibility for parole, and forced to make its life and death decision on a false premise. At the time of his resentencing, the defendant had already long been sentenced to a term of imprisonment of 100 years, to be served consecutively to any sentence imposed for his murder conviction.[22] That is an undisputed fact. But the jury was deprived of this most relevant information in considering its sentencing recommendation. On the other hand, the jury was aware that the defendant had already served some twenty years in prison and he would be technically eligible for parole in a mere five years if he was sentenced to life in prison without eligibility for parole for twenty-five years, the only alternative to death. That the jury was concerned about the defendant's early release if a life sentence was imposed was made abundantly evident on the record when the jury came back into court with a specific question about this immediately after retiring to deliberate. The jury was concerned that the defendant had already served some twenty years of the twenty-five-year minimum of the life sentence alternative to death that must be served before parole eligibility.
What you end up with is a jury that may be naturally reluctant to recommend life knowing the defendant will soon be eligible for parole if a life sentence is imposed. But what these jurors are never told is that a judge, also concerned with the defendant's possible release from incarceration, has already added an additional 100 years to the defendant's sentence, all to be served consecutive to the murder sentence. In other words, the sentencing judge has already acted to see that what the jury might fear cannot happen. But this obviously important and relevant information is then hidden from the jury. Would jurors charged with the awesome responsibility of making a life or death recommendation be aided by knowing the defendant already had a 100-year sentence to be served consecutive to any sentence imposed for the murder? Of course. Is a sentence recommended without this important knowledge flawed? Of course.
Finally, the majority decision clearly violates the spirit of the United States Supreme Court's decision in Simmons v. South Carolina, 512 U.S. 154, 114 S.Ct. 2187, 129 L.Ed.2d 133 (1994), where the plurality opinion declared:
In this case, the jury reasonably may have believed that petitioner could be released on parole if he were not executed. To the extent this misunderstanding pervaded the jury's deliberations, it had the effect of creating a false choice between sentencing petitioner to death and sentencing him to a limited period of incarceration. This grievous misperception was encouraged by the trial court's refusal to provide the jury with accurate information regarding petitioner's parole ineligibility, and by the *1098 State's repeated suggestion that petitioner would pose a future danger to society if he were not executed.... The State thus succeeded in securing a death sentence on the ground, at least in part, of petitioner's future dangerousness, while at the same time concealing from the sentencing jury the true meaning of its noncapital sentencing alternative, namely, that life imprisonment meant life without parole. We think it is clear that the State denied petitioner due process.
Id. at 161-62, 114 S.Ct. 2187 (plurality opinion). This Court should not be a party to a process that affirmatively misleads a sentencing jury as to the true meaning and effect of the sentencing alternatives presented to it. I fear we have done so here.
PARIENTE, J., concurs.
NOTES
[1] The trial court found that (1) Booker previously had been convicted of a felony involving the use of threat of violence to another; (2) Booker committed the murder during the commission of a sexual battery and burglary; and (3) the murder committed by Booker was especially heinous, atrocious, or cruel.
[2] See Brown v. Wainwright, 392 So.2d 1327 (Fla.) (denying petitions for writ of habeas corpus filed by Booker and 122 other inmates), cert. denied, 454 U.S. 1000, 102 S.Ct. 542, 70 L.Ed.2d 407 (1981); Booker v. State, 413 So.2d 756 (Fla.1982); Booker v. Wainwright, 675 F.2d 1150 (11th Cir.1982); Booker v. Wainwright, 703 F.2d 1251 (11th Cir.);cert. denied, 464 U.S. 922, 104 S.Ct. 290, 78 L.Ed.2d 266 (1983); Booker v. State, 441 So.2d 148 (Fla.1983); Booker v. Wainwright, 764 F.2d 1371 (11th Cir.), cert. denied, 474 U.S. 975, 106 S.Ct. 339, 88 L.Ed.2d 324 (1985); Wainwright v. Booker, 473 U.S. 935, 106 S.Ct. 30, 106 S.Ct. 3343, 87 L.Ed.2d 706 (1985); State v. Booker, 479 So.2d 118 (Fla. 1985); State v. Crews, 477 So.2d 984 (Fla. 1985) (denying State's petition to vacate stay of execution); Booker v. State, 503 So.2d 888 (Fla.1987); Booker v. Dugger, 825 F.2d 281 (11th Cir.1987), cert. denied, 485 U.S. 1015, 108 S.Ct. 1488, 99 L.Ed.2d 716 (1988).
[3] Justice Kogan, joined by Justice Barkett, disagreed with the majority's conclusion that the Hitchcock error was harmless. See Booker, 520 So.2d at 250 (Kogan and Barkett, JJ., dissenting).
[4] Mr. Marvin Sylvester Thomas, Sr., a former guard at Florida State Prison, explained how Booker had burned him with a flammable substance while he was passing by Booker's prison cell, which was the crime for which Booker was convicted of aggravated battery.
[5] The State presented three witnesses to explain the facts underlying Booker's first-degree murder, sexual assault, and burglary convictions: Mr. Pete Fancher; Mr. David Smith; and Dr. Chantal Harrison. Mr. Fancher, a former officer with the Gainesville Police Department (G.P.D.), was the first officer to respond to the murder scene. Mr. Smith, also a former officer with G.P.D., was one of the crime scene investigators who responded to the murder scene. Finally, Dr. Harrison, a former associate medical examiner with Alachua County, performed the autopsy of the murder victim.
[6] Dr. Barnard disagreed with this diagnosis.
[7] Regarding these inconsistencies, Dr. Barnard testified that in his first interview with Booker in December 1977, Booker stated that he did not recall the events surrounding the crime. In a subsequent interview conducted in February 1978, Booker recalled various details concerning events leading up to the crime and the crime itself. Finally, in a third interview conducted in April 1978, Booker initially indicated that he could not recall the events surrounding the crime, but upon being reminded that he previously had provided such details, Booker again recounted various events that occurred on the day of the crime.
[8] These witnesses included: (1) Professor Deborah Tall, professor of English at Hobart and William Smith College, as well as editor of Seneca Review; (2) Ms. Suzann Tamminen, Editor-In-Chief at Wesleyan University Press; (3) Professor Hayden Carruth, Professor Emeritus at Syracuse University (by video); (4) Professor Stuart Lavin, writer and professor at Castleton State College; (5) Professor Stuart Friebert, poet and professor at Oberlin College; and (6) Professor Williard Spiegleman, professor of English at Southern Methodist University.
[9] The State did not present additional evidence during the Spencer hearing, but the defense presented a videotaped statement by James E. Coleman, Jr., who previously had represented Booker in death warrant proceedings, as well as live statements made by Mrs. Zyromski and three other members of the murder victim's family, with the substance of all the statements being that Booker should receive a life sentence on his first-degree murder conviction.
[10] The trial court considered, but gave no weight to, the statements made by Mrs. Zyromski and other members of the victim's family, which urged that Booker be sentenced to life in prison.
[11] When making the Neil objection, defense counsel did not immediately identify on the record that Ms. Filer was black. Counsel did so, however, shortly after returning from a lunch recess, and at that time, the trial judge noted, "Ms. Filer was of a distinctdistinctly identifiable racial or ethnic group, and she was black American, and the Court concurs."
[12] Earlier during voir dire, Mr. Pepper indicated that he had been "published in newspapers and magazines" on various subjects, most recently "on the gasoline prices and the fact that they're higher in Alachua County."
[13] As set forth in footnote 8, supra, the defense presented six witnesses with ties to academia to testify, in primary part, about Booker's accomplishments in poetry.
[14] In fact, Ms. Leggett compared herself to Ms. Filer during voir dire, stating that "the library [is] one of my favorite places, so I read a little bit of everything."
[15] As stated above, the trial court below afforded "great weight" to four aggravating circumstances: (1) Booker committed the capital felony while he was under sentence of imprisonment; (2) Booker previously had been convicted of a violent felony; (3) Booker committed the capital felony while he was engaged in the commission of a sexual battery and burglary; and (4) HAC. The court also found two statutory mitigating circumstances: (1) Booker committed the capital felony while he was under the influence of extreme mental or emotional disturbances (great weight); and (2) Booker's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was substantially impaired (substantial weight). Finally, the court found nine nonstatutory mitigating circumstances: (1) Booker was sexually abused as a child (substantial weight); (2) Booker was physically abused as a child (substantial weight); (3) Booker was verbally abused as a child (moderate weight); (4) Booker's family life was inconsistent (moderate weight); (5) Booker's education was interrupted repeatedly (slight weight); (6) Booker suffered from alcohol and drug abuse (moderate weight); (7) while in prison, Booker substantially improved his ability to be a productive citizen and to produce creative valuable contributions to American Literature (little weight); (8) Booker demonstrated his remorse and attempted to atone for his crime (little weight); and (9) Booker was honorably discharged from the United States Army (slight weight).
[16] In his initial brief, Booker challenged, at least implicitly, the weight that the trial court afforded the aggravating circumstances. See Initial Brief of Appellant at 57-59. In his reply brief, however, Booker explicitly abandoned any such challenge. See Reply Brief of Appellant at 19 ("Booker never asked this Court to reweigh any of the aggravators or mitigators found by the court.").
[17] We similarly find Booker's reliance on Urbin v. State, 714 So.2d 411 (Fla.1998); Curtis v. State, 685 So.2d 1234 (Fla.1996); and Knowles v. State, 632 So.2d 62 (Fla.1993), to be misplaced. Unlike this case, both Urbin and Curtis involved defendants who were seventeen years old at the time they committed the murders, a fact we found weighty in vacating the death penalty in those respective cases on proportionality grounds. See Urbin, 714 So.2d at 417; Curtis, 685 So.2d at 1237. Moreover, unlike this case, Knowles involved only one valid aggravating circumstance balanced against the two statutory mental mitigating circumstances and additional nonstatutory mitigation. See 632 So.2d at 67-68.
[18] In so doing, we distinguished both Fitzpatrick and Knowles, decisions on which Booker relies in this case.
[19] Defense counsel indicated in opening statements that Mrs. Zyromski would be the last defense witness to testify. However, due to a problem with another defense witness's schedule, Mrs. Zyromski actually was the second-to-last witness to testify on Booker's behalf.
[20] During the hearing, Mrs. Zyromski testified: "She [the victim, Mrs. Harmon] was like a grandmother to us, us kids. She was my great aunt, as far as kinship goes. My own mother's mom died when my mother was eight years old, and so Mrs. Harmon helped raise my mother from that point." In light of the fact that the State does not challenge whether Mrs. Zyromski qualifies as "next of kin" as that phrase is used in article I, section 16(b) of the Florida Constitution, we do not decide that issue here. Instead, we assume for purposes of analysis that Mrs. Zyromski falls within the purview of the constitutional provision.
[21] In support of this international law claim, Booker cites the International Covenant on Civil and Political Rights, as well as the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment.
[22] The crimes for which this 100-year sentence had been imposed were actually used as statutory aggravation against the defendant.