969 So.2d 186 (2007)
Stephen Todd BOOKER, Appellant,
v.
STATE of Florida, Appellee.
No. SC06-121.
Supreme Court of Florida.
August 30, 2007.
Rehearing Denied November 1, 2007.
*188 Harry P. Brody and Jeffrey M. Hazen of Brody and Hazen, P.A., Tallahassee, FL, for Appellant.
Bill McCollum, Attorney General, and Meredith Charbula, Assistant Attorney General, Tallahassee, FL, for Appellee.
PER CURIAM.
This case is before the Court on appeal from an order denying a motion to vacate under Florida Rule of Criminal Procedure 3.851. The order concerns postconviction relief from a sentence of death, and this Court has jurisdiction of the appeal under article V, section 3(b)(1), Florida Constitution.

FACTS AND PROCEDURAL BACKGROUND
Stephen T. Booker was convicted of the 1977 first-degree murder and sexual battery of Lorine Demoss Harmon, a ninety-four-year-old woman, and also the crime of burglary. See Booker v. State, 773 So.2d 1079, 1081 (Fla.2000). In the opinion affirming the imposition of the death penalty after resentencing, the Court detailed the facts surrounding the murder:
The victim, an elderly woman, was found dead in her apartment in Gainesville, Florida. The cause of death was loss of blood due to several knife wounds in the chest area. Two knives, apparently used in the homicide, were embedded in the body of the victim. A pathologist located semen and blood in the vaginal area of the victim and concluded that sexual intercourse had occurred prior to death. The apartment was found to be in a state of disarray; drawers were pulled out and their contents strewn about the apartment. Fingerprints of the defendant were positively identified as being consistent with latent fingerprints lifted from the scene of the homicide. The defendant had a pair of boots which had a print pattern similar to those seen by an officer at the scene of the homicide.
Test results indicated that body hairs found on the clothing of the defendant at the time of his arrest were consistent with hairs taken from the body of the victim.
After being given the appropriate warnings, the defendant made a statement, speaking as an alternative personality named "Aniel." The "Aniel" character made a statement that "Steve had done it."
Id. at 1081-82 (quoting Booker v. State, 397 So.2d 910, 912 (Fla.1981)). During Booker's first penalty phase, the jury recommended the death penalty by a vote of nine to three. See id. at 1082. Following that recommendation, the trial court sentenced Booker to death. See id. On direct appeal, this Court affirmed Booker's conviction and sentence. See id. However, in 1991, the United States Court of Appeals for the Eleventh Circuit affirmed a federal district court ruling which set aside Booker's death sentence because the trial court committed a Hitchcock error. *189 See id.[1] After a new penalty phase was held, the jury recommended the death penalty by a vote of eight to four. See 773 So.2d at 1086. The trial court again imposed the death penalty, found the following four aggravating factors, and gave each circumstance great weight: (1) the crime was committed while Booker was under sentence of imprisonment; (2) Booker had a conviction of a prior violent felony; (3) the crime was committed while Booker was engaged in the commission of a sexual battery and burglary; and (4) the crime was especially heinous, atrocious, or cruel (HAC). See id. With regard to mitigating circumstances, the Court's opinion on direct appeal after resentencing reveals:
The court found two statutory mitigating circumstances: (1) Booker committed the capital felony while he was under the influence of extreme mental or emotional disturbances (great weight); and (2) Booker's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was substantially impaired (substantial weight). Finally, the court found nine nonstatutory mitigating circumstances: (1) Booker was sexually abused as a child (substantial weight); (2) Booker was physically abused as a child (substantial weight); (3) Booker was verbally abused as a child (moderate weight); (4) Booker's family life was inconsistent (moderate weight); (5) Booker's education was interrupted repeatedly (slight weight); (6) Booker suffered from alcohol and drug abuse (moderate weight); (7) while in prison, Booker substantially improved his ability to be a productive citizen and to produce creative valuable contributions to American Literature (little weight); (8) Booker demonstrated his remorse and attempted to atone for his crime (little weight); and (9) Booker was honorably discharged from the United States Army (slight weight). [N.10]
[N.10] The trial court considered, but gave no weight to, the statements made by Mrs. Zyromski and other members of the victim's family, which urged that Booker be sentenced to life in prison.
Id. at 1086. On appeal, this Court affirmed Booker's sentence. See id. at 1081, 1096.
On May 18, 2004, Booker filed a motion for postconviction relief in which he asserted the following claims: (1) counsel was ineffective because (a) two jurors who said they would not consider mitigating evidence remained on the jury simply because they were African-Americans;[2] (b) available factual evidence with regard to Booker's prior violent felony conviction was not presented, which would have demonstrated to the jurors that the charge actually constituted mitigation instead of aggravation; (c) no objection was made under Crawford v. Washington, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), to the reading of testimony from the first *190 trial; to the reading of Booker's 1974 and 1980 judgments to the jury; and to a witness's testimony "summing up" the evidence and the investigation; (d) witnesses who could have testified as to mitigation with regard to Booker's upbringing and his literary accomplishments were not presented; (e) no objection was voiced to the introduction of testimony with regard to Booker's unrelated collateral crimes; (f) no objection was made to the instruction to the jury that it should not consider the testimony of the victim's great niece, Page Zyromski, that she found Booker's remorse to be sincere; (g) no objection was made to numerous improper statements by the prosecution during closing argument; and (h) Michael "Mick" Price, who was previously employed by the Gainesville Police Department, was not presented to rebut the testimony of Dr. Barnard with regard to the issue of malingering and Booker's honesty; (2) the State violated Booker's attorney-client privilege by improperly opening and reading his mail without disclosing this fact to Booker's counsel; (3) Booker was denied his right to equal protection when the trial court did not instruct the jury on the length of time that Booker would be in jail if he received a life sentence; (4) Florida's sentencing scheme is unconstitutional under Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002); (5) the presentation of hearsay during the resentencing trial violated the Confrontation Clause under Crawford; (6) Booker's twenty-seven-year incarceration on death row constitutes cruel and unusual punishment; (7) Booker has matured into an essential literary voice, and to execute him would implicate the freedom of the press and freedom of expression; and (8) an unsigned sentencing order in the State's files creates the prima facie presumption that the State improperly drafted the sentencing order or that the trial court did not conduct the proper weighing of the evidence.
After a Huff[3] hearing was held, the trial court issued an order granting an evidentiary hearing on Claim II, allowing Booker to amend Claims I(a), (b), and (d), and summarily denying the remainder of Booker's motion. On January 15, 2005, Booker filed an amendment to his postconviction motion. The trial court held a second Huff hearing on Booker's amendment and issued a subsequent order summarily denying Claims I(a), (b), and (d).
On September 16, 2005, the trial court held an evidentiary hearing on Claim II, in which Booker had alleged that the State had improperly interfered with his mail. During the evidentiary hearing, Assistant State Attorney Ralph Grabel testified that he was not aware of a "mail cover" being placed on Booker's correspondence,[4] that he had never read Booker's mail, and that he was unaware of anyone else in the State Attorney's Office reading Booker's mail. Booker's counsel then presented to Grabel a memo from an investigator for the State (Michael "Mick" Price)[5] addressed to Grabel and his co-prosecutor, Rod Smith, stating that an employee at Florida State Prison "asked whether or not we wanted mail cover on BOOKER. I declined the offer on the expectation that Johnny Kearns [Booker's attorney on resentencing] would eat us alive if he found out. If you believe otherwise, I'll simply call Ruise back and *191 he'll handle it." Grabel was also shown other dated entries in the memo by Price referencing "mail cover." In one entry, Price wrote that "on 3-28-97, before leaving FSP, I picked up another collection of letters obtained under mail cover." In another, Price wrote:
On 4-10-97, while in the Starke areas hunting GASKINS, I drove past FSP and picked up another packet of mail cover. On 4-11-97, while reviewing the above mail cover, I ran across a letter written by BOOKER to Betty VOGH (a Gainesvillian who expects to be called as a witness) which informs VOGH of the "scuttlebutt" that the officers ". . . originators of the lies [Re: hand up dress incident] . . . have received suspensions on an unrelated incident."
Grabel testified that prior to seeing the memo, he would have said that no discussion of "mail cover" had ever occurred. However, he conceded during the hearing that there was apparently a memo sent to him discussing, among other issues, "mail cover." Grabel verified that Price had been sent to the prison by then-State Attorney Smith to obtain information about other incidents of a disciplinary nature that could be used to rebut the defense's argument that Booker is now a literary person and that his life was worth saving. However, Grabel reiterated that he has never utilized "mail cover" to gain a benefit for the State, and that he did not direct anyone to intercept any attorney-client privileged mail of Booker.
Rod Smith testified that while he was a state attorney, there were certain circumstances under which he would have authorized the use of "mail cover"; however, he did not request a mail cover on Booker's mail during the resentencing proceedings because it was not necessary. Smith verified that as lead counsel in the case, if "mail cover" were to be ordered, it would have been he (Smith) who would have authorized the procedure, and he did not. When Smith reviewed the memos from Mick Price, he conceded that it appeared that some form of "mail cover" of Booker's mail had occurred, but he reiterated that he did not authorize it, and if it had occurred, it was conducted without his authority. Smith also testified that the first time he had seen the memo from Price referencing the "mail cover" was the week of the evidentiary hearing. Smith asserted that, to his knowledge, the State Attorney's Office did not monitor Booker's mail, and he had never personally reviewed any mail that had been copied or taken from Booker.
The role of Mick Price in the Booker resentencing proceedings was to interview witnesses, and he did not recall any form of "mail cover" on Booker's mail. However, when Price reviewed the memo that he directed to Smith and Grabel, he conceded that it appeared that he had obtained some of Booker's prison mail. He stated that if he had been picking up "mail cover," he would have delivered it to the State Attorney's Office because he was working there at the time. However, he testified that the memo did not look familiar to him, and he had no recollection of reading Booker's mail. Further, on cross-examination, he testified that he did not recall having any conversations with Grabel or Smith with regard to "mail cover," he did not recall being asked to obtain "mail cover," and he did not recall bringing any mail back to the State Attorney's Office.
To rebut Booker's claims of tampering with legal mail, the State presented attorney Johnny Kearns, who represented Booker during resentencing. Attorney Kearns testified that his office was close to Florida State Prison, and either he or one of his investigators delivered all legal documents and mail to Booker by hand. *192 Kearns stated that he would observe the prison officials check the legal documents for contraband, and then they would hand the materials to Booker. Kearns stated that he only sent two letters to Booker through the mailthe first contained a money order for stamps, and the second addressed a court status conference and informed Booker that his case had been continued. Kearns testified that Booker had authored approximately fifty letters to him. Booker would write across the back of the envelope where it was sealed either the words "legal mail" or a series of X's across the seam. Kearns testified that it was his understanding that Booker was attempting to ensure that any tampering with his legal mail could be observed and identified. Kearns testified that he saw "no visible tampering or opening of the mail from the time they were sealed to the time that I received them." Kearns saw no signs of any tampering. Kearns further stated that at no time did he have concerns that the State had improperly obtained any information that was then used to subvert his strategy in representing Booker. Kearns testified that he would have objected to a State investigator obtaining privileged mail and reporting its contents to the prosecution. Kearns stated that he was not aware that Price had been picking up Booker's letters obtained under "mail cover." Upon reading the entry which discussed the letter from Booker to Betty Vogh, Kearns testified that if he had known about Price's actions, he would have inquired as to why the State was reading Booker's mail; however, he also recognized that the "letter from Mr. Booker to Ms. Vogh is not legal mail."
On November 22, 2005, the trial court entered an order denying Claim II. The trial court concluded that Booker had failed to present any evidence of tampering with his legal mail. The trial court concluded that Grabel and Smith were highly credible witnesses and accorded great weight to their testimony that they did not direct that Booker's mail be intercepted or opened and that they had not read any of Booker's mail. Although the trial court concluded that Mick Price was "quite a bit older and his memory . . . was perhaps not as good as it used to be," it accepted his testimony that he did not tamper with Booker's legal mail. Finally, in reaching the determination that no tampering with legal mail occurred, the trial court relied on the testimony of Kearns, who "went out of his way to keep Mr. Booker from being concerned about mail tampering by hand delivering any communications."
Booker appeals the denial of his rule 3.851 motion.

ANALYSIS

"Mail Cover"
The case upon which Booker relies to contend that the attorney-client privilege was violated when an agent of the State intercepted his mail is Weatherford v. Bursey, 429 U.S. 545, 97 S.Ct. 837, 51 L.Ed.2d 30 (1977). In that case, Weatherford was an undercover agent for the South Carolina Law Enforcement Division. See id. at 547, 97 S.Ct. 837. Weatherford was "arrested" with defendant Bursey for vandalizing a selective service office. See id. While maintaining his cover, Weatherford, at the request of Bursey and his counsel, attended two meetings where they discussed the upcoming trial. See id. at 547-48, 97 S.Ct. 837. At Bursey's trial, Weatherford appeared as a witness and testified with regard to his undercover activities. See id. at 549, 97 S.Ct. 837. After his conviction, Bursey filed a claim for violation of constitutional rights under 42 U.S.C. § 1983 asserting that Weatherford had communicated defense strategies to *193 his superiors and prosecuting officials which he had learned in meetings with Bursey and his attorney, which deprived Bursey of the effective assistance of counsel and his right to a fair trial. See id. The United States Supreme Court ultimately concluded that Bursey's section 1983 claim failed because Weatherford did not communicate any defense strategy to the prosecution and did not purposefully intrude on the meetings between Bursey and his counsel. See id. at 558, 97 S.Ct. 837. The Court further explained:
[W]e need not agree with petitioners that whenever a defendant converses with his counsel in the presence of a third party thought to be a confederate and ally, the defendant assumes the risk and cannot complain if the third party turns out to be an informer for the government who has reported on the conversations to the prosecution and who testifies about them at the defendant's trial. Had Weatherford testified at Bursey's trial as to the conversation between Bursey and Wise [Bursey's counsel]; had any of the State's evidence originated in these conversations; had those overheard conversations been used in any other way to the substantial detriment of Bursey; or even had the prosecution learned from Weatherford, an undercover agent, the details of the Bursey-Wise conversations about trial preparations, Bursey would have a much stronger case.
Id. at 554, 97 S.Ct. 837.
As the above analysis demonstrates, the Weatherford case addressed actual attorney-client communications; it did not involve Bursey speaking with or writing to a layperson. Further, the decisions which discuss the constitutional implications of intercepting inmate mail focus on legal mail rather than on correspondence with laypeople. See generally Davis v. Goord, 320 F.3d 346, 351 (2d Cir.2003) ("Interference with legal mail implicates a prison inmate's rights to access to the courts and free speech as guaranteed by the First and Fourteenth Amendments to the U.S. Constitution."); Jensen v. Klecker, 648 F.2d 1179, 1182 (8th Cir.1981) (rejecting claim that "the routine inspection of incoming and outgoing nonlegal mail constitutes a violation of [inmates'] civil rights"); Thomsen v. Ross, 368 F.Supp.2d 961, 973-74 (D.Minn.2005) ("A jailer who opens a prisoner's legal mail outside of the prisoner's presence may violate a prisoner's constitutional rights."). Booker does not present any case to support the proposition that if a government official or agent reads an inmate's nonlegal mail, the Sixth or Fourteenth Amendments become implicated. With this status of the law, we conclude that the key issue presented by this claim is whether the State interfered with Booker's legal mail, not whether the State (or its agent) ever accessed Booker's nonlegal mail.
In the order denying postconviction relief, the trial court made very specific findings with regard to whether tampering with Booker's legal mail had occurred:
The Defendant has failed to present any evidence demonstrating the Defendant's legal mail was tampered with by any agent of the State. The Defendant, likewise, failed to present any evidence that privileged communications, in any form, were impermissibly intercepted, interfered with, or used by any agent of the State. Not only does the evidence not support the Defendant's claim his legal mail was tampered with or that the State knowingly interfered with his attorney-client relationship, there is a great deal of evidence to support it was not.
Following the denial of a postconviction claim where the trial court has conducted *194 an evidentiary hearing, this Court affords deference to the trial court's factual findings. See Walls v. State, 926 So.2d 1156, 1165 (Fla.2006). If the trial court's findings are supported by competent, substantial evidence, this Court will not substitute its judgment for that of the trial court on questions of fact. See id. The same standard applies to the credibility of the witnesses as well as the weight to be given to the evidence by the trial court. See id.
We conclude that the trial court's finding that neither the State nor its agent, Investigator Mick Price, tampered or interfered with Booker's legal mail is supported by competent, substantial evidence. Although the extensive facts developed during the evidentiary hearing reveal that some sort of "mail cover" may have occurred, and that Price may have retrieved mail from Florida State Prison, Booker has failed to identify a single piece of legal mail that was intercepted or touched by Price. Booker speculates that Price had collected some of Booker's mail, and, therefore, "all mail in and all mail out of FSP was compromised by the `mail cover.'" However, Booker offers absolutely no substantive proof to support this conclusory statement. Further, even if we were to assume that Price did collect some of Booker's legal mail under the "mail cover," coprosecutors Rod Smith and Ralph Grabel denied ever having read any of Booker's mail, let alone his legal mail, and the trial court found their testimony to be credible. Cf. Pietri v. State, 885 So.2d 245, 272 (Fla.2004) (rejecting Weatherford claim where a document prepared by defense counsel's investigator was allegedly stolen and obtained by the State and noting that "[t]he state attorney maintained that he never read nor had access to the stolen document, and defense counsel did not challenge that assertion").
Further, the most compelling evidence that the State did not access Booker's legal mail was presented by Booker's resentencing counsel, Johnny Kearns. Kearns testified that he or one of his investigators had actually hand-delivered all but two pieces of correspondence to Booker, and the two pieces of mail that were sent to the prison did not contain any information with regard to the defense strategy. Moreover, Kearns testified that Booker took heightened precautions to ensure that his mail was not tampered with by writing either "legal mail" or a series of X's across the seal of the envelope, and Kearns saw "no visible tampering or opening of the mail from the time that they were sealed to the time that [he] received them." Kearns stated that had he suspected that the State was tampering with Booker's legal mail, he would have objected because he "would definitely have gotten concerned about" the interception of legal mail.
Competent, substantial evidence supports the trial court's conclusion that the State did not access, tamper with, or interfere with Booker's legal mail, and we affirm the trial court's denial of Booker's Weatherford claim.[6]

Abandoned Claims
When a defendant fails to pursue an issue during proceedings before the *195 trial court, and then attempts to present that issue on appeal, this Court deems the claim to have been abandoned or waived. See Mungin v. State, 932 So.2d 986, 995 (Fla.2006). We conclude that Booker has abandoned the following claims: (1) counsel was ineffective for failing to object to the trial court instructing the jury not to consider witness Page Zyromski's testimony; (2) counsel was ineffective for failing to call Mick Price to rebut Dr. Barnard's testimony regarding possible malingering by Booker; (3) counsel was ineffective for failing to object to testimony regarding the introduction of nonstatutory aggravators that involved Booker's unrelated collateral crimes; and (4) counsel was ineffective for failing to object to prosecutorial statements during closing argument. The record reflects that although Booker attempted to raise these claims in his initial postconviction motion, they were insufficiently pled. Additionally, during the first Huff hearing, Booker did not raise or argue these issues, nor did he request permission to amend the portions of Claim I that addressed these issues.[7] Moreover, Booker failed to reassert these claims in his amendment to Claim I. We conclude that Booker completely failed to pursue these claims in the proceedings before the trial court, and, therefore, they have been abandoned.

Claims Denied Without an Evidentiary Hearing
Because the decision whether to grant an evidentiary hearing on this postconviction motion below was ultimately based on written materials before the court, the ruling was tantamount to a pure question of law, subject to de novo review. See State v. Coney, 845 So.2d 120, 137 (Fla.2003). Accordingly, when we review the summary denial of claims raised in the motion below, this Court accepts the movant's factual allegations as true, and we will affirm the ruling only if the filings show that the movant has failed to state a facially sufficient claim or that there is no issue of material fact to be determined. See generally Amendments to Fla. Rules of Crim. Pro. 3.851, 772 So.2d 488, 491 n. 2 (Fla.2000) (endorsing the proposition that "an evidentiary hearing is mandated on initial motions which assert . . . legally cognizable claims which allege an ultimate factual basis"). However, to the extent there is any question as to whether the movant has made a facially sufficient claim requiring a factual determination, the Court will presume that an evidentiary hearing is required. See generally id. It is under this standard of review that this claim and the remainder of Booker's claims will be analyzed.
I. The Prior Violent Felony Aggravator. Booker contends that the trial court erred in summarily denying his claim that counsel was ineffective for failing to present evidence regarding the inapplicability of the prior violent felony aggravator in this case. In 1980, Booker committed an aggravated battery when he threw a flaming substance at a former Florida State Prison guard and burned him. Booker contends that had the trial court ordered an evidentiary hearing on this claim, Booker would have presented witnesses who would have described the context in which this "fire-bomb" incident occurred. Booker asserts that if counsel had presented this testimony to the jury, it would have viewed Booker's actions in a more sympathetic context and would have viewed his conviction for aggravated battery *196 as evidence in mitigation rather than aggravation.
To establish a claim of ineffective assistance of trial counsel for failing to call certain witnesses, a defendant must allege in the motion "what testimony defense counsel could have elicited from [the] witnesses and how defense counsel's failure to call, interview, or present the witnesses who would have so testified prejudiced the case." Nelson v. State, 875 So.2d 579, 583 (Fla.2004).[8] If the claim is insufficiently pled, a defendant should be given leave to amend his claim; however, if the claim is not amended, then the denial may be with prejudice. See 875 So.2d at 583-84.
In his initial motion, Booker failed to allege the names of the witnesses he would have presented to testify with regard to the alleged "fire-bomb" incident which resulted in his conviction for aggravated battery. In accordance with Nelson, the trial court provided Booker with an opportunity to amend this claim. In his amendment, Booker proceeded to name himself, inmate Gary Trawick, and inmate William White as witnesses who might testify as to the alleged threats that the guard had made against Booker in the context of a "guard riot" that occurred after an inmate had fatally stabbed a prison guard. Booker also named attorney Susan Cary, a death row liaison from the Palm Beach County public defender's office, who would have testified that litigation may have stemmed from the guards' post-stabbing conduct.
We conclude that the trial court properly denied this claim without an evidentiary hearing because this claim as amended was still insufficiently pled. In the amended motion, Booker made equivocal statements about the substance of the witnesses' testimony. For example, Booker stated that "inmates Trawick and White might have testified to the threats which the guard, Mr. Thomas, made against Mr. Booker." (Emphasis supplied.) With regard to attorney Cary, Booker stated that Cary "believes that there may have been litigation stemming from the guards' post-stabbing conduct which the Department of Corrections may have settled." (Emphasis supplied.) Thus, while not totally speculative, there is clearly a lack of specificity as to the substance of the testimony that these witnesses would have offered. Cf. Bryant v. State, 901 So.2d 810, 821-22 (Fla.2005) (concluding that a 3.851 claim of ineffective assistance was legally insufficient where the substance of the testimony was not described in the motion and the motion did not allege the specific facts to which the witness would testify). Further, Booker failed to allege such pivotal facts as what first-hand knowledge attorney Cary possessed with regard to the "fire-bomb" incident and whether inmates Trawick and White had actually witnessed prison guard Thomas threaten Booker. With these omissions, we conclude that Booker's amended claim failed to comply with the pleading requirements announced in Nelson. Therefore, we affirm the trial court's summary denial of this claim.
Moreover, even if this claim had been sufficiently pled, we conclude that Booker still would not have been entitled to relief. The record of the resentencing proceedings demonstrates that the State initially sought to present multiple witnesses to expand upon the "fire-bomb" incident, including an expansion upon possible motives involved in the incident. Counsel for Booker objected to this expansion, contending that the additional testimony *197 would cause the prior violent felony to become a feature of the trial. The trial court agreed, concluded that the prejudice of this type of testimony would outweigh any probative value, and sustained the objection. The trial court further sustained objections to the presentation of testimony with regard to the medical treatment that the guard received for his burns and the length of time that he was hospitalized for the injuries. The trial court only allowed testimony with regard to the incident itself.
Thus, the trial court precluded the introduction of evidence with regard to matters prior to the attack or after the attack and when the guard was transported to the hospital. Given the strict parameters established by the trial court with regard to the admission of evidence of the "firebomb" incident, we conclude that, had counsel for Booker attempted to introduce expanded testimony that attempted to address broad circumstances and motives under which the incident may have occurred, it similarly would have been precluded by the trial court. Therefore, we conclude that trial counsel was not ineffective for failing to offer witnesses to present this testimony. See generally Marquard v. State, 850 So.2d 417, 431 (Fla.2002) ("Trial counsel cannot be faulted for failing to hire and call a witness whose testimony would not be relevant or admissible. . . . ").
II. Counsel's Failure to Investigate and Present Mitigation. Under this claim, Booker alleged that his counsel was ineffective for failing to offer evidence of the full scope of Booker's accomplishments as an influential figure on the literary scene. According to Booker, his counsel failed to educate himself on the topic of poetry. As a result, counsel could not effectively respond to the State's assertion that a poet should not be treated differently than anyone else. Booker contended that, had counsel been better prepared, he could have shown that sparing Booker's life has precedence in literature.
As with the prior issue, when Booker initially raised this claim in his 3.851 motion, he did not name the witnesses that defense counsel should have called, and he failed to outline the specific substance of their testimony. Rather, Booker made general statements such as the following:
Counsel failed to present available evidence of the full scope and extent of Mr. Booker's accomplishment as an influential figure on the national and international literary "scene." Numerous witnesses could have been called to explain to the jury Mr. Booker's accomplishment in this regard, as could exhibits of Mr. Booker's work, which would have explained the person in a unique and powerful fashion.
As with the prior violent felony claim, the trial court provided Booker with an opportunity to amend his motion with respect to this issue. In his amendment, Booker named six witnesses, stating that they would educate the jury on the literary tradition into which Booker's work fits and more accurately educate the jury on his contributions to the rich vein of American and international letters into which his works feed and from which he has derived his themes. He also asserted that three additional witnesses who were experts on the poet Ezra Pound could have been called "to show why and how [Pound] had been freed from a death sentence." In denying this claim, the trial court stated during the Huff hearing:
I've already indicated that the weight to be given to this particular mitigating circumstance is extremely slight. The fact that one has learned a skill, whether it's poetry or cabinet-building or whatever it may be, the practice of law, is not a reason not to impose the death penalty.

*198 If Shakespeare committed this crime, regrettably, I think we would be missing a lot of enjoyable plays. You're not excused from following the law because, especially after the fact, you become adept at some skill.
In the order summarily denying this claim, the trial court elaborated:
During the penalty phase, trial counsel presented more than ample evidence of Defendant's literary accomplishments while on death row. This Court placed little weight on this evidence. Any alleged failure to present additional and cumulative testimony would have not resulted in a life sentence.
As with the prior issue, we conclude that the instant claim was insufficiently pled under Nelson. Booker failed to specify what the precise testimony of each of these witnesses would have been, how their testimony would have differed from the six poetry experts who testified during Booker's resentencing, or how counsel was deficient in selecting those six experts who did testify.
Moreover, even if this claim had been sufficient, Booker cannot demonstrate that his counsel was ineffective. Following the United States Supreme Court's decision in Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), this Court has held that for ineffective assistance of counsel claims to be successful, two requirements must be satisfied:
First, the claimant must identify particular acts or omissions of the lawyer that are shown to be outside the broad range of reasonably competent performance under prevailing professional standards. Second, the clear, substantial deficiency shown must further be demonstrated to have so affected the fairness and reliability of the proceeding that confidence in the outcome is undermined. A court considering a claim of ineffectiveness of counsel need not make a specific ruling on the performance component of the test when it is clear that the prejudice component is not satisfied.
Maxwell v. Wainwright, 490 So.2d 927, 932 (Fla.1986) (citations omitted). During the resentencing proceedings, trial counsel called the following six witnesses to testify with regard to Booker's literary accomplishments while he has been incarcerated:
(1) Professor Deborah Tall, professor of English at Hobart and William Smith College, as well as editor of Seneca Review; (2) Ms. Suzann Tamminen, Editor-In-Chief at Wesleyan University Press; (3) Professor Hayden Carruth, Professor Emeritus at Syracuse University (by video); (4) Professor Stuart Lavin, writer and professor at Castleton State College; (5) Professor Stuart Friebert, poet and professor at Oberlin College; and (6) Professor Williard Spiegleman, professor of English at Southern Methodist University.
Booker, 773 So.2d at 1085 n. 8.
Professor Tall testified that Booker is "a remarkably original writer and very, very skilled in his use of language," that he "has tremendous insight into character, into his own and others," and that "he writes like no one else. I mean, very very valuable poems." She also testified that Booker's book "Tug" earned the endorsement of the first African-American to win the Pulitzer Prize, Gwendolyn Brooks. Professor Hayden Carruth made the following statements via videotape with regard to Booker as a poet:
I don't think of anyone else whom I would compare with him. I can't think of other people who had done work similar to his, in somewhat similar situations, particularly in recent years. Black writers who have also been in *199 prison, people like Ethridge Knight (phonetic). But also black writers who have not been in prison.
. . . .
People are interested in him. He is doing work that is on the one hand significantly connected to the work of his colleagues, black writers, and on the other hand, new and different and original. (Inaudible). In that sense I think he is comparable to a good many poets.
When asked what Booker's place is in the literary community, Carruth responded: "He's a person of consequence, he's a person of great intelligence and perception." Professor Lavin testified that Booker's style was "visionary" and that Booker "transmutes . . . language. He actually transforms it. So when you read his work, it evokes something beyond just what the words themselves say." Professor Friebert testified with regard to Booker's involvement in translating the work of "arguably Albania's most important poet" into English. Professor Friebert also read one of Booker's poems, titled "Prospectus," to the jury. Finally, on cross-examination, Friebert verified that poet Ezra Pound was prosecuted as a traitor, but was later pardoned due to the intercession of individuals who admired his work.
Trial counsel is not deficient for failing to present cumulative evidence. See Duckett v. State, 918 So.2d 224, 237 (Fla.2005), cert. denied, ___ U.S. ___, 127 S.Ct. 103, 166 L.Ed.2d 78 (2006). Given the extensive testimony with regard to Booker's accomplishments and value as a poet, had defense counsel called the nine witnesses listed in Booker's amendment, their testimony would merely have been cumulative to that of the six individuals who testified during the resentencing proceeding. Moreover, Booker cannot demonstrate that he was prejudiced by counsel's failure to present cumulative evidence, especially in light of the fact that the trial court noted in its denial order that (1) it gave little weight to this mitigator in its sentencing order, and (2) "[a]ny alleged failure to present additional or cumulative testimony would not have resulted in a life sentence." See also Maxwell, 490 So.2d at 932 ("It is highly doubtful that more complete knowledge of appellant's childhood circumstances, mental and emotional problems, school and prison records, etc., would have influenced the jury to recommend or the judge to impose a sentence of life imprisonment rather than death."). Therefore, we affirm the trial court's summary denial of this claim.
III. Jury Instruction. Booker next claims that the trial court erred in summarily denying his claim that the failure to give an instruction to the jury regarding the amount of time that Booker was facing in prison if he received a life sentence violates equal protection. This claim is procedurally barred because claims that address the adequacy or constitutionality of jury instructions must be raised on direct appeal. See Rodriguez v. State, 919 So.2d 1252, 1280 (Fla.2005). Indeed, on direct appeal, Booker asserted that "the trial court erred by refusing to inform the jury regarding the consecutive sentences Booker received for his prior burglary, sexual battery, and aggravated assault convictions." Booker, 773 So.2d at 1087. This Court denied Booker's claim on the merits, noting that "[t]he introduction of this evidence would open the door to conjecture and speculation as to how much time a prisoner serves of a sentence and distract jurors from the relevant issue of what is the appropriate sentence for the murder conviction." Id. at 1088 (quoting Bates v. State, 750 So.2d 6, 11 (Fla.1999)). Thus, Booker already has challenged the propriety of this jury instruction, and he is *200 procedurally barred from raising subsequent challenges in the instant proceeding. See Thompson v. State, 759 So.2d 650, 665 (Fla.2000) (stating that substantive challenges to jury instructions are procedurally barred in postconviction proceedings because the claims could and should be raised on direct appeal). The trial court properly denied this claim without holding an evidentiary hearing.
IV. Crawford. Booker next claims that the trial court erred in summarily denying his claim that that the presentation of hearsay materials to the jury violated Crawford v. Washington, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). In Crawford, the United States Supreme Court held that "[w]here testimonial evidence is at issue . . . the Sixth Amendment demands what the common law required: unavailability and a prior opportunity for cross-examination." Id. at 68, 124 S.Ct. 1354. However, in Chandler v. Crosby, 916 So.2d 728 (Fla.2005), cert. denied, ___ U.S. ___, 127 S.Ct. 382, 166 L.Ed.2d 275 (2006), we held that Crawford does not apply retroactively. See id. at 729. Booker's resentencing proceedings were held in 1998, roughly six years before the decision in Crawford was issued. Therefore, Crawford is inapplicable to Booker, and we conclude the trial court's summary denial of this claim was appropriate.
V. Length of Incarceration. Booker contends that the trial court erred in summarily denying his claim that his incarceration for almost thirty years on death row constitutes cruel and unusual punishment. We conclude that the trial court properly denied this claim without an evidentiary hearing. Booker has already asserted on direct appeal that "to execute him after he has already spent over two decades on death row would constitute cruel and unusual punishment under the Eighth Amendment to the Constitution of the United States." Booker, 773 So.2d at 1096. In rejecting this claim, we noted that no federal or state court has accepted the argument that a prolonged stay on death row constitutes cruel and unusual punishment, especially where both parties bear responsibility for the long delay. See id. Additionally, in Lucas v. State, 841 So.2d 380 (Fla.2003), this Court affirmed the trial court's summary denial of a claim that the defendant's extended stay on death row constituted cruel and unusual punishment. See id. at 389 ("Despite his length of stay, under this Court's clear precedent, the trial court did not err in refusing to grant him an evidentiary hearing on his claim of cruel and unusual punishment."). We similarly affirm the trial court's summary denial of this claim.
VI. Newly Discovered Evidence. In his final claim, Booker asserts that the trial court erred in summarily denying his claim that newly discovered evidence has emerged which demonstrates that to execute him at this time would serve no legitimate penological purpose and would infringe upon the First Amendment right of the public to continue reading his work. In this claim, Booker contends that his literary talent has continued to mature, and that numerous editors would testify to the value of preserving his unique and important voice. According to Booker, the American public has acquired an interest in his work, such that the public's interest in vengeance is outweighed by its interest in benefiting from Booker's literary voice. Booker asserts that because of the great benefits to society that he can offer, his life should be spared.
We conclude that the trial court properly denied this claim without an evidentiary hearing. Booker has cited no decision, Florida or otherwise, for the proposition that a death row inmate's literary accomplishments constitute newly discovered evidence *201 that mandates vacation of a death sentence. Booker similarly provides no legal support for his First Amendment claim. Therefore, we affirm the summary denial of this claim.

CONCLUSION
For the foregoing reasons, we affirm the trial court's denial of the rule 3.851 motion.
It is so ordered.
LEWIS, C.J., and WELLS, ANSTEAD, PARIENTE, QUINCE, CANTERO, and BELL, JJ., concur.
NOTES
[1] In Hitchcock v. Dugger, 481 U.S. 393, 107 S.Ct. 1821, 95 L.Ed.2d 347 (1987), the United States Supreme Court held that a death sentence is invalid where the advisory jury "was instructed not to consider, and the sentencing judge refused to consider, evidence of nonstatutory mitigating circumstances." Id. at 398-99, 107 S.Ct. 1821. In 1988, this Court denied a habeas petition filed by Booker in which he alleged a Hitchcock error. See Booker v. Dugger, 520 So.2d 246, 249 (Fla. 1988). This Court concluded that even though the penalty phase jury instruction was erroneous, the error was harmless. See id. However, in Booker v. Dugger, 922 F.2d 633 (11th Cir.1991), the Eleventh Circuit held that the error was not harmless. See id.
[2] Booker later amended this claim to reflect that only one juror remained on the jury solely because of her race.
[3] Huff v. State, 622 So.2d 982 (Fla.1993).
[4] In the instant proceedings, the term "mail cover" appears to be used to describe a procedure in which the mail of inmates is monitored by prison staff.
[5] Prior to working for the State, Price was employed by the Gainesville Police Department.
[6] Further, even if Booker had successfully established that the State had intruded into Booker's attorney-client relationship, he would not be entitled to relief under Weatherford unless he could show "prejudice in terms of injury to the defendant or benefit to the State." Pietri, 885 So.2d at 272 ("Because the state attorney had no access to the [allegedly stolen] document, Pietri has failed to demonstrate how he was prejudiced by the state attorney prosecuting the case."). Booker has failed to identify a single fact gleaned from the alleged "mail cover" that was used to Booker's disadvantage or to the State's advantage at trial.
[7] Instead, Booker specifically requested leave to amend only Claims 1(a) (the juror challenge), 1(b) (the circumstances surrounding Booker's prior felony aggravator), and 1(d) (the failure to present available mitigation).
[8] Although Nelson was a noncapital case that involved Florida Rule of Criminal Procedure 3.850, we have applied the pleading requirements enunciated in Nelson to rule 3.851 motions to vacate. See Bryant v. State, 901 So.2d 810, 821-22 (Fla.2005).