*698
 
 PER CURIAM.
 

 Jeffrey G. Hutchinson appeals an order of the trial court denying his motion to vacate his conviction for first-degree murder and his sentence of death pursuant to Florida Rule of Criminal Procedure 3.851. We have jurisdiction.
 
 See
 
 art. V, § 3(b)(1), Fla. Const. For the reasons expressed below, we affirm the trial court’s order denying postconviction relief.
 

 FACTS AND PROCEDURAL HISTORY
 

 Jeffrey G. Hutchinson was charged and convicted of four counts of first-degree murder with a firearm for the murders of his live-in girlfriend, Renee Flaherty, and her three children: four-year-old Logan, seven-year-old Amanda, and nine-year-old Geoffrey. Hutchinson was sentenced to death for the murder of each child.
 

 The relevant facts concerning the murders are as follows. On the evening of the murders, Hutchinson and Renee argued. Hutchinson packed some of his clothes and guns into his truck, left, and went to a bar. Renee then called her friend, Francis Pruitt (Pruitt), in Washington and told her that she thought Hutchinson had left for good. The bartender testified that Hutchinson arrived around 8 p.m. Hutchinson told the bartender, “Renee is pissed off at me,” drank one and a half glasses of beer and then left the bar muttering to himself. Other witnesses testified that Hutchinson drove recklessly after he left the bar.
 

 Approximately forty minutes after Hutchinson left the bar, there was a 911 call from Hutchinson’s home. The caller stated, “I just shot my family.” Two of Hutchinson’s close friends identified the caller’s voice as Hutchinson’s. Hutchinson said to the 911 operator, “There were some guys here.” He told the operator that he did not know how many people were there, how many had been hurt, or how they had been injured. Deputies arrived at Hutchinson’s home within ten minutes of the 911 call and found Hutchinson on the ground in the garage with the cordless phone nearby. The phone call was still connected to the 911 operator. Deputies found Renee’s body on the bed in the master bedroom, Amanda’s body on the floor near the bed in the master bedroom, and Logan’s body at the foot of the bed in the master bedroom. Each had been shot once in the head with a shotgun. Deputies found Geoffrey’s body on the floor in the living room between the couch and the coffee table. He had been shot once in the chest and once in the head. The murder weapon, a Mossberg 12-gauge pistol-grip shotgun that belonged to Hutchinson, was found on the kitchen counter. Hutchinson had gunshot residue on his hands. He also had Geoffrey’s body tissue on his leg.
 

 Hutchinson’s defense at trial was that two men came into the house, he struggled with them, and they shot Renee and the children and fled. Hutchinson was examined by an EMT at the scene and a jail nurse. He had no injuries. Hutchinson also presented the defense of intoxication, and he argued that this was a crime of passion, not first-degree murder. The jury found Hutchinson guilty of four counts of first-degree murder.
 

 Hutchinson waived a jury recommendation at sentencing. The trial court conducted a colloquy, found the waiver voluntary, and excused the jury. At sentencing, the State presented several witnesses, including Dr. Michael E. Berkland, a forensic pathologist. Dr. Berkland testified that the events occurred as follows: The front door had been locked with a dead bolt. The front door was “busted” down, and Geoffrey’s blood was found on the top of the door indicating that Geoffrey was shot after the door was “busted” down. The shooting started in the master bed
 
 *699
 
 room. Renee was the first victim, shot once in the head- — a conclusion drawn from the fact that Renee was still lying on the bed at the time she was shot. Amanda was shot second with one shot to her head. Dr. Berkland reached this conclusion because not much of Logan’s blood was on Amanda, and there would have been more of his blood on her had Logan been shot second. Logan was the third to be shot. Three shell casings were found inside the master bedroom in front of the closet. Dr. Berkland concluded from the shell casings that Hutchinson was standing in front of the closet when he shot the first three victims. Hutchinson then shot Geoffrey twice. Geoffrey was first shot just outside the doorway of the master bedroom. The first shot went through his arm, which was in a defensive posture, and through his chest. Dr. Berkland concluded that Geoffrey was able to see the bodies of his mother, sister, and brother from this location. The second shot was to Geoffrey’s head. Geoffrey was kneeling at the time of the second shot, and Dr. Berkland concluded, Geoffrey “absolutely was conscious” at the time of the second shot. He died in the living room on the floor between the couch and the coffee table.
 

 The defense presented evidence of mitigation, including evidence involving Hutchinson’s diagnosis of Gulf War syndrome and attention deficit disorder, his family life, and evidence of awards and honors he received. The State presented evidence in rebuttal. Both parties presented sentencing memoranda, and the trial court held a
 
 Spencer
 
 hearing.
 
 [1]
 
 The trial court then held a sentencing hearing where he imposed a life sentence for the murder of Renee Flaherty and three death sentences for the murders of the three children.
 

 On direct appeal, Hutchinson raised ten issues.
 
 [2]
 
 The State filed a cross-appeal raising one issue: whether aggravated child abuse should have been properly considered separately from the under-the-age-of-twelve aggravator. This Court rejected Hutchinson’s arguments on all of his claims and rejected the State’s argument on cross-appeal. As a result, the Court affirmed the convictions and sentences of death.
 
 See Hutchinson v. State,
 
 882 So.2d 943 (Fla.2004).
 

 In October 2005, Hutchinson filed his initial postconviction motion pursuant to Florida Rule of Criminal Procedure 3.851. In February 2006, the trial court held a
 
 Huff
 

 [3]
 

 hearing. As a result, the trial court summarily denied two of the seven claims. A second amended postconviction motion was filed after Hutchinson’s original post-conviction counsel withdrew and the trial court appointed new postconviction counsel. The second motion raised four claims and contained an assertion of actual innocence. Subsequently, the trial court en
 
 *700
 
 tered an order summarily denying the actual innocence claim and one of the other four claims raised in the second amended postconviction motion. After an evidentia-ry hearing was held on the other claims, the trial court issued an order denying all of Hutchinson’s postconviction claims.
 

 RULE 3.851 APPEAL
 

 Hutchinson appeals the denial of post-conviction relief to this Court raising three issues. He contends (1) trial counsel rendered ineffective assistance during the guilt phase by failing to present evidence that Hutchinson’s voice was not on the 911 audio tape; (2) trial counsel rendered ineffective assistance during the guilt phase by failing to introduce into evidence the nylon stocking found at the crime scene; and (3) the trial court erred in summarily denying Hutchinson’s claims of actual innocence and conflict of interest.
 

 Hutchinson argues that trial counsel rendered ineffective assistance during the guilt phase of his trial. In order to prevail on a claim of ineffective assistance of counsel, a defendant must show that trial counsel’s performance was deficient and that the deficient performance prejudiced the defendant so as to deprive the defendant of a fair trial.
 
 See Strickland v. Washington,
 
 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984);
 
 see also Wiggins v. Smith,
 
 539 U.S. 510, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003) (affirming the
 
 Strickland
 
 two-prong analysis for claims of ineffective assistance of counsel). As to the first prong, the defendant must establish that “counsel made errors so serious that counsel was not functioning as the ‘counsel’ guaranteed the defendant by the Sixth Amendment.”
 
 Strickland,
 
 466 U.S. at 687, 104 S.Ct. 2052;
 
 see also Cherry v. State,
 
 659 So.2d 1069, 1072 (Fla.1995). For the second prong, the reviewing court must determine whether there is a reasonable probability that, but for the deficiency, the result of the proceeding would have been different.
 
 See Strickland,
 
 466 U.S. at 694, 104 S.Ct. 2052. “A reasonable probability is a probability sufficient to undermine confidence in the outcome.”
 
 Id.
 
 “Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.”
 
 Id.
 
 at 687, 104 S.Ct. 2052.
 

 Generally, this Court’s standard of review following a denial of a postcon-viction claim where the trial court has conducted an evidentiary hearing accords deference to the trial court’s factual findings.
 
 See McLin v. State,
 
 827 So.2d 948, 954 n. 4 (Fla.2002). “As long as the trial court’s findings are supported by competent substantial evidence, ‘this Court will not substitute its judgment for that of the trial court on questions of fact, likewise of the credibility of the witnesses as well as the weight to be given to the evidence by the trial court.’”
 
 Blanco v. State,
 
 702 So.2d 1250, 1252 (Fla.1997) (quoting
 
 Demps v. State,
 
 462 So.2d 1074, 1075 (Fla.1984)). However, the trial court’s legal conclusions are subject to de novo review.
 
 See Sochor v. State,
 
 883 So.2d 766, 771-72 (Fla.2004).
 

 Hutchinson also contends that the trial court erred in summarily denying several of his postconviction claims. To uphold the trial court’s summary denial of claims raised in an initial postconviction motion, the record must conclusively demonstrate that the defendant is not entitled to relief.
 
 See Foster v. State,
 
 810 So.2d 910, 914 (Fla.2002) (citing
 
 Kennedy v. State,
 
 547 So.2d 912, 913 (Fla.1989)). Where no evidentiary hearing is held below, we must accept the defendant’s factual allegations to the extent that they are not refuted by the record.
 
 See Lightbourne v. Dugger,
 
 549 So.2d 1364, 1365
 
 *701
 
 (Fla.1989). Otherwise, an evidentiary hearing must be held whenever the mov-ant makes a facially sufficient claim that requires a factual determination.
 
 See generally Amendments to Fla. Rules of Crim. Pro. 3.851, 3.852, & 3.993,
 
 772 So.2d 488, 491 n. 2 (Fla.2000);
 
 see .also Booker v. State,
 
 969 So.2d 186, 195 (Fla.2007).
 

 Voice on 911 Audiotape
 

 Hutchinson contends that trial counsel was ineffective for failing to present evidence through the testimony of friends and family members that Hutchinson’s voice was not on the 911 audiotape. The trial court did not find the evidentiary hearing testimony of Hutchinson’s friends and family members persuasive because of their relationship to Hutchinson and their inability to recall statements by the caller on the audiotape other than “I just shot (or killed) my family.” The trial court concluded that trial counsel did not render ineffective assistance because trial counsel made a reasonable strategic decision not to challenge the identification of the voice in order to maintain credibility with the jury. The court also concluded that there was no prejudice due to the incriminating content of the 911 tape, the testimony of two friends identifying Hutchinson’s voice as the caller on the tape, and Hutchinson’s location at the residence with the telephone near him that was still connected to the 911 call when the police officers arrived.
 

 We find that the evidentiary hearing testimony supports the trial court’s finding that trial counsel did not render ineffective assistance. At the evidentiary hearing, postconviction counsel called six witnesses that were either related to Hutchinson or were Mends of Hutchinson’s family. Each witness testified that he or she had listened to the tape sometime before the trial and concluded it was not Hutchinson’s voice on the tape. However, none of the witnesses could remember any statements from the tape except “I just shot (or killed) my family.” Nicholas Peterson, Hutchinson’s attorney before the legal team of Stephen and Kimberly Cobb took over representation, also testified at the eviden-tiary hearing. He testified that during the time he represented Hutchinson, he got a copy of the 911 tape and played it for various members of Hutchinson’s family, including his mother and father, and his friends, Creighton and Deanna Adams. All four persons agreed that it was Hutchinson’s voice on the 911 tape. Mr. Peterson relayed this information to Mr. Cobb. Hutchinson’s trial counsel, Mr. Cobb, testified at the evidentiary hearing that he investigated the possibility of presenting witnesses to contest the State’s argument that it was Hutchinson’s voice on the tape, but then decided that it was not a viable route. He explained that after he took some depositions, he began running into problems such as the inconsistency of Hutchinson’s father, who first stated it was not Hutchinson’s voice on the tape, but then said it was his voice. Due to the inconsistencies, he believed that if he attempted to argue to the jury that it was not Hutchinson’s voice, the jury would not believe it and he would lose all credibility with them. Mr. Cobb testified that it would be strategically smarter to dispute the meaning of the words said in closing argument.
 
 [4]
 

 We find that trial counsel made a reasonable strategic decision not to chal
 
 *702
 
 lenge the voice on the 911 tape, and instead, argue the meaning of the statement. It is not deficient performance to make a strategic decision for the purpose of retaining credibility with the jury.
 
 See Henry v. State,
 
 948 So.2d 609 (Fla.2006) (finding that the Court has repeatedly rejected ineffectiveness claims when the allegedly improper conduct was the result of a deliberate trial strategy);
 
 Atwater v. State,
 
 788 So.2d 223, 230 (Fla.2001) (“Sometimes concession of guilt to some of the prosecutor’s claims is good trial strategy and within defense counsel’s discretion in order to gain credibility and acceptance of the jury.”). Because Hutchinson has failed to establish deficient performance, we need not examine his claim of prejudice.
 
 See Strickland,
 
 466 U.S. at 697, 104 S.Ct. 2052 (“[Tjhere is no reason for a court deciding an ineffective assistance claim ... to address both components of the inquiry if the defendant makes an insufficient showing on one.”);
 
 see also Derrick v. State,
 
 983 So.2d 443, 461 (Fla.2008).
 

 Accordingly, we affirm the trial court’s denial of relief on this claim.
 

 Nylon Stocking
 

 Hutchinson next contends counsel was ineffective for failing to present evidence that a tan nylon stocking was found in the backyard of the crime scene. Hutchinson argues that this evidence would have supported his claim that two masked intruders committed the murders. The trial court found that trial counsel was not ineffective for failing to present this evidence because the description of the nylon stocking found in the backyard did not match the information Hutchinson gave the detectives and further investigation of the stocking revealed that it was used as a pool filter at the residence. We agree.
 

 At the evidentiary hearing, Investigator Darryl Fields testified that during pretrial investigation, he went to the residence of the victims. In examining the residence, he found a lady’s tan colored nylon stocking in the backyard. He described this stocking as a one leg stocking that did not have any eye holes cut into it. This description of the stocking would not have supported Hutchinson’s description of what the alleged intruders had on their faces. During Hutchinson’s taped interview following his arrest and throughout the guilt phase of his trial, Hutchinson’s defense was that two men broke into the house, he struggled with them, and they shot the victims. In the taped interview, Hutchinson repeatedly described the two men as wearing black ski masks. Therefore, presenting the evidence of a tan colored, lady’s nylon stocking that had no eye holes cut into it would not have supported Hutchinson’s contention that two other men committed the murders. Moreover, trial counsel testified at the evidentiary hearing that he investigated the discovery of this tan colored nylon stocking, but this investigation revealed that the stocking was actually used as a pool filter at the residence.
 

 Hutchinson fails to satisfy either prong of
 
 Strickland.
 
 We, therefore, affirm the trial court’s denial of relief on this claim.
 

 Actual Innocence
 

 In his amended motion for postconviction relief, Hutchinson listed the facts found by this Court and then alleged that these findings by the Court, as far as they incriminate Hutchinson, were mistaken and in error. Hutchinson then gave his rendition of the facts of the case to demonstrate that he is innocent of the crimes. In its order summarily denying the additional claims raised in the amended post-
 
 *703
 
 conviction motion, the trial court construed this claim as an actual innocence claim. The trial court then held that such a claim was not cognizable in a postconviction motion absent a showing of newly discovered evidence, which Hutchinson failed to allege in his motion. The trial court further found that it was improper for it to review this Court’s findings as to the sufficiency of the evidence. Hutchinson now asserts that the trial court misconstrued the nature of his claim as an actual innocence claim. He argues that in his motion, he merely swore to facts that he asserts existed at the time of trial and were known to his legal counsel but were never brought to the attention of the jury. He contends that had this evidence been presented to the jury, it would have served to strengthen his claim that he was not guilty of the murders.
 
 [5]
 

 A review of Hutchinson’s amended motion for postconviction relief demonstrates that he raised an actual innocence claim. Hutchinson explicitly argued that the findings of fact of this Court were mistaken and that the “State of Florida has made a tragic mistake by sending an innocent man to death row for a crime he did not commit.” We find that this actual innocence claim is without merit. On direct appeal, we reviewed the evidence and concluded that the evidence was “sufficient to sustain a conviction of premeditated first-degree murder.”
 
 Hutchinson,
 
 882 So.2d at 956. Thus, the trial court did not err in summarily denying Hutchinson’s actual innocence claim.
 
 See Jimenez v. State,
 
 997 So.2d 1056 (Fla.2008) (because the Court on direct appeal concluded that the evidence did not support the claim that defendant was innocent, defendant’s claim of factual innocence in postconviction proceedings was without merit).
 

 Conflict of Interest
 

 Hutchinson’s final contention is that the trial court erred in summarily denying his claim that he was not represented by conflict-free counsel based on trial counsel’s personal dislike of him and based on the fact that Hutchinson filed a Bar complaint against trial counsel. In summarily denying this claim, the trial court concluded that a trial counsel’s personal dislike of the defendant does not constitute a conflict of interest.
 

 Both aspects of Hutchinson’s claim have been addressed and decided adversely to his position. In rejecting the claim that the Sixth Amendment guarantees a “meaningful relationship” between an accused and his counsel, the United States Supreme Court has emphasized that “No court could possibly guarantee that a defendant will develop the kind of rapport with his attorney — privately retained or provided by the public — that the Court of Appeals thought part of the Sixth Amendment guarantee of counsel.”
 
 Morris v. Slappy,
 
 461 U.S. 1, 13-14, 103 S.Ct. 1610, 75 L.Ed.2d 610 (1983). Also, the filing of a
 
 *704
 
 Bar complaint does not per se constitute a conflict of interest.
 
 See Connor v. State,
 
 979 So.2d 852, 861 (Fla.2007) (denying relief on conflict of interest claim because while defendant alleged conflict of interest based on the fact that he filed a Florida Bar grievance against his counsel, he failed to allege or demonstrate how the alleged conflict impacted counsel’s performance at the competency hearing).
 

 Hutchinson nonetheless asserts that although the filing of a Bar complaint against trial counsel does not create a per se conflict of interest, it is a factor to be considered when evaluating such claims. He alleges that the filing of the Bar complaint impacted counsel’s performance during trial in several ways. Hutchinson argues that trial counsel (1) never presented a viable defense during the entire trial; (2) assigned his wife, who was inexperienced in capital litigation, to prepare for the penalty phase and then waived a penalty phase jury; (3) removed his firm’s investigator from the case just days before trial; (4) abandoned viable issues raised by the defendant; and (5) repeatedly asked questions of state witnesses on cross-examination that highlighted evidence detrimental to the defendant thereby opening the door for more damaging evidence from these witnesses on redirect examination.
 

 We find these contentions are either refuted by the record or insufficiently pled. In the opinion on direct appeal, this Court specifically noted that counsel raised two defenses at trial: (1) that two masked intruders committed the murders; and (2) Hutchinson was intoxicated and the crime was one of passion, not first-degree murder.
 
 Hutchinson,
 
 882 So.2d at 948-49. The record also indicates that Hutchinson was not coerced into waiving a penalty phase jury. During the evidentiary hearing, defense counsel’s wife testified that she and Mr. Cobb discussed waiving a penalty phase jury with Hutchinson and Hutchinson agreed with the decision. She also testified that he was not forced by either her or Mr. Cobb in deciding to waive a penalty phase jury. The testimony presented at the evidentiary hearing also demonstrates that trial counsel used a paralegal who was working in his firm as an investigator for the case because she was a former military police officer who had previously conducted investigations. Trial counsel met with her on a regular basis and had her go through the evidence and talk to Hutchinson. Trial counsel also testified that he discussed the possibility of waiving a penalty phase jury with the investigator. Hutchinson’s last two contentions are not sufficiently pled. He argues that trial counsel abandoned viable issues raised by Hutchinson without explaining what viable issues were allegedly abandoned. He also argues that trial counsel repeatedly asked questions to state witnesses on cross-examination that highlighted evidence detrimental to the defendant without providing specific examples.
 

 Accordingly, Hutchinson fails to establish any correlation between his filing of a Bar complaint against trial counsel and counsel’s decisions during the trial. Because a conflict of interest has not been demonstrated, we affirm the trial court’s summary denial of relief on this claim.
 

 CONCLUSION
 

 For the reasons stated above, we affirm the trial court’s denial of postconviction relief on all claims.
 

 It is so ordered.
 

 QUINCE, C.J., and PARIENTE, LEWIS, CANADY, POLSTON, and LABARGA, JJ., concur. PERRY, J., did not participate.
 

 [1]
 

 .
 
 Spencer v. State,
 
 615 So.2d 688 (Fla.1993).
 

 [2]
 

 . The following issues were raised: (1) whether the trial court improperly instructed the jury; (2) whether the trial court erred in admitting certain testimony as an excited utterance; (3) whether the trial court erred in repeatedly overruling objections to the State's closing argument; (4) whether the trial court erred in denying Hutchinson’s motion for mistrial; (5) whether the trial court erred in denying Hutchinson’s motion for judgment of acquittal; (6) whether the trial court erred in denying Hutchinson's motion for a new trial; (7) whether the trial court erred in considering section 921.141 (5)( 1), Florida Statutes (2000), as an aggravating circumstance; (8) whether the trial court erred in finding that Hutchinson committed the murder of the children during the course of an act of aggravated child abuse; (9) whether the trial court erred in finding heinous, atrocious, or cruel (HAC) as an aggravating circumstance in the murder of Geoffrey Flaherty; and (10) whether death is a proportional sentence.
 

 [3]
 

 . Huff v. State,
 
 622 So.2d 982 (Fla.1993).
 

 [4]
 

 . In his closing arguments, trial counsel contended that the statement "I just shot my family" should be looked at figuratively instead of literally because of the circumstances under which Hutchinson said these words. He explained that Hutchinson was in pain and distress and had high alcohol content in his body, which should be factors to consider in determining whether a literal or figurative
 
 *702
 
 interpretation should be used to understand the meaning of Hutchinson's statement.
 

 [5]
 

 . Hutchinson also contends that this evidence would have supported his claim of ineffective assistance of counsel. Even if we were to accept Hutchinson's contention that he is actually arguing ineffectiveness due to trial counsel’s failure to present evidence of his innocence to the jury, such a claim is not cognizable on this appeal because it is being raised for the first time. In his amended postconviction motion, Hutchinson simply argued that the findings of this Court were mistaken and then listed the alleged facts that proved his innocence. He never claimed ineffective assistance of counsel for failing to present evidence of innocence. Accordingly, the claim is unpreserved.
 
 See Connor v. State,
 
 979 So.2d 852 (Fla.2007) (because the confrontation issue was not raised in defendant's postconviction motion, the issue could not be heard for the first time on appeal of the postconviction motion);
 
 Steinhorst v. State,
 
 412 So.2d 332, 338 (Fla.1982) ("[F]or an argument to be cognizable on appeal, it must be the specific contention asserted as legal ground for the objection, exception, or motion below.”).